1997 ME 34

**Patricia LAWTON et al.**

v.

**Carol C. RICHMOND et al.**

Supreme Judicial Court of Maine.

Submitted on briefs Jan. 8, 1997.

Decided March 3, 1997.

John R. Bass, II, Thompson, McNaboe, Ashley & Bull, Portland, for plaintiffs.

John Alsop, Alsop & Mohlar, Norridgewock, for Carol Richmond.

Wm. Thomas Hyde, Merrill, Hyde, Fortier & Young, P.A., Skowhegan, for Michael Demo.

Before: ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

GLASSMAN, Justice.

[¶1] Patricia Lawton and Rebecca Dionne (Lawton) appeal from the judgment entered in the Superior Court (Somerset County, *Kravchuk, J.*) in favor of Carol C. Richmond and Brian R. Richmond following a non-jury trial on the Lawton complaint and the Richmonds' counterclaim based on a dispute as to the location of the back boundary line of property owned by the Richmonds.[1] The Lawtons contend the trial court erred by its determination as a matter of law that the description of the property contained in the deed to the Richmonds is ambiguous, thereby allowing the admission of extrinsic evidence as to the location of the boundary and the court's admission of certain evidence. We affirm the judgment.

[¶2] The record reveals the following undisputed facts: The Lawtons are the grandchildren of Beulah Richardson, who in the 1930s owned over 100 acres of property on the easterly side of Oak Pond in Skowhegan. Beginning in 1939, she deeded a number of shorefront lots to various individuals, retaining ownership of the land behind the shore lots. On October 18, 1949, Beulah deeded three shorefront lots. The description in each of the deeds had as a beginning point "the east shore of Oak Pond at low water mark" and each contained the statement "intending hereby to convey a lot of land one hundred (100) feet square." No survey was done and, although descriptions in each of the three deeds referenced corner posts, no such monuments were located by the surveyor engaged by the Lawtons or by the Richardsons. Nor could the surveyors establish the low water mark of Oak Pond. All three conveyances provided for a right-of-way over an established road for the purpose of access to the respective lots.

[¶3] Lot #1 was conveyed to Adrian T. Laney and Thelma Laney, the predecessors in title to the Richmonds, by a deed containing the following description:

Beginning on the east shore of Oak Pond at low water mark and at the northwest corner of land of Florence Gilman; thence easterly along the north line of said Gilman land one hundred (100) feet to a post set in the ground; thence northerly one hundred (100) feet to a post set in the ground; thence westerly one hundred (100) feet to the east shore of Oak Pond at low water mark; thence southerly along the shore of Oak Pond at low water mark one hundred (100) feet to the point of beginning; intending hereby to convey a lot of land one hundred (100) feet square; together with a right-of-way, in common with others, over an established road as described in deeds to said Florence Gilman and others.

The record does not disclose any description of the Florence Gilman land. The Laneys constructed a camp on the lot which fell into disrepair in 1962. From that date until the Richmonds acquired ownership of the lot in 1988 there were no improvements to the lot. The remains of the Laney camp were found on the ground in the area of the septic system installed by the Richmonds.

[¶4] Lot #2 was conveyed by Beulah to her son, Blaine, and daughter-in-law, Virginia, the parents of the Lawtons. On the death of Beulah and of their parents, the Lawtons inherited this lot as well as the land behind the shore parcels. Lot #2 is unimproved and has never had a structure placed on it.

[¶5] Lot #3 was conveyed by Beulah to Ralph Cullen and Lucy Cullen. In 1954, Beulah conveyed to the Cullens a small gore of land, approximately 15–feet wide, for the apparent purpose of eliminating a gap between the back boundary of the lot and the road that runs behind the shorefront lots. This gap is only met if the lot beginning is at a steel pipe located on the bank above Oak Pond. This lot was developed and contains a camp and several outbuildings.

[¶6] When the Richmonds purchased Lot #1, they believed they could build a camp on

---

1. The Richmonds filed a third-party complaint against Michael Demo as a third-party defendant. The judgment entered in favor of Demo and the dismissal as moot of the Richmonds' counterclaim for unjust enrichment have not been challenged by the Richmonds. Demo's counterclaim against the Richmonds and the Richmonds' supplemental counterclaim against the Lawtons were severed for a separate trial and are not at issue in this appeal.

it and applied for the necessary permits. The town officials suggested the Richmonds obtain a survey before permits were issued. The Richmonds employed Michael Demo to perform a survey.[2] In reliance on his survey, the necessary building and plumbing permits were issued by the town and the state. After learning in 1990 that the Richmonds had constructed a camp and septic system, the Lawtons in 1992 hired Michael Sackett to do a boundary survey. He concluded the septic system and some portion of the camp was on the Lawtons' property.

[¶ 7] The Lawtons filed the present multi-count complaint against the Richmonds, *inter alia*, to establish title to the disputed parcel. By their answer and a counterclaim, the Richmonds also sought title to the parcel. From the judgment entered in favor of the Richmonds, the Lawtons appeal.

[¶ 8] The Lawtons first contend that the trial court erred as a matter of law by adopting the agreement of the parties that a grantor could own property only to the high water mark of a pond and determining on that basis that the reference to the "low water mark" in the October 18, 1949, deeds created an ambiguity permitting the introduction of extrinsic evidence. We agree, as do the Richmonds, that the use of words "shore of Oak Pond" together with the clear designation of "at low water mark" in the October 18, 1949, deeds conveyed title of the property to the low water mark, i.e., the level to which the water recedes in the summer months. *Snyder v. Haagen*, 679 A.2d 510, 514 n. 5 (Me.1996) (citing Hermansen & Richards, *Maine Principles of Ownership Along Water Bodies*, 47 Me.L.Rev. 35, 51 (1995)). We conclude, however, there is a latent ambiguity in the description of the Richmond deed that permitted the introduction of extrinsic evidence. *See Town of Lisbon v. Thayer Corp.*, 675 A.2d 514, 517 (Me. 1996) (judgment granted on erroneous basis will be affirmed on review if proper on other grounds).

[¶ 9] The law is well established that the determination of the boundaries of

property as ascertained from a deed is a question of law. Where boundaries are on the face of the earth is a question of fact and the court's factual finding in that regard will not be disturbed unless clearly erroneous. *Snyder v. Haagen*, 679 A.2d at 513 (citations omitted). "A latent ambiguity occurs when, 'in applying the description to the ground, the facts extrinsic to the document controvert or in some way render unclear the deed's apparently unambiguous terms.'" *Id.* (quoting *Taylor v. Hanson*, 541 A.2d 155, 158 (Me.1988)). When a latent ambiguity occurs, the court must determine the grantor's intent from contemporaneous circumstances and standard rules of construction. *Perkins v. Graves*, 642 A.2d 1349, 1351 (Me.1994) (citation omitted). The standard rules of construction dictate that boundaries are controlled, in descending order of priority, by monuments, courses, distances and quantity "unless this produces a result that is absurd or manifestly inconsistent with the parties' intentions." *Id.* (citation omitted).

[¶ 10] Here, the October 18, 1949, deeds, including the Laney deed, indicate that Beulah intended to convey in each instance a one-hundred-foot square parcel starting on the east shore of Oak Pond at the low water mark and with a closing call along the shore of Oak Pond at low water mark. A square is a figure having four equal sides and four right angles. The surveyors testified as to their inability to locate the low water mark or the corner posts referenced in the three deeds. Neither surveyor identified or located the northwest corner or north line of the Gilman land. Sackett also testified that the east shore line of Oak Pond was not a straight line but "meandering" with "nooks and crannies." The court viewed the property and made the additional finding that the shoreline was not a beach or level ground; that in each of the three lots the shoreline is quite steep and slopes downward toward the pond with an extremely sharp drop-off at certain spots; and in front of all three lots the embankment takes up the first 10 to 20 feet of land.

---

**2.** Beulah Richardson and Blaine Richardson predeceased Virginia Richardson. At the time of the

Demo survey, Virginia owned Lot #2 and the property behind the shore parcels.

[¶ 11] The court determined that two steel pipes, located on the Cullen lot approximately 15–20 feet from the shore, that appeared to have been in the ground for some time, and the existing roadway should control the dispute as to the back boundary of the Richmond lot. The court reasoned that, because the Cullen lot and the Laney–Richmond lot had been created on the same date with the same description, it was fair to assume that Beulah intended to fix the "low water mark" at the same point on both lots. The Cullen lot measures almost exactly 115 feet from the steel pipes to the existing roadway. The court used the monuments on the Cullen lot across the shoreline to establish the beginning point of the Richmond lot at approximately 22 feet from the shoreline. The court found the location of the remains of the shack, constructed by the Laneys contemporaneous in time with Beulah's life, and the testimony of Demo that he personally remembered visiting the property as a young boy and seeing the shack in the approximate location of the remains, supported the court's determination as to location of the disputed boundary. Sackett was unable to demonstrate to the court at the time of the court's view of the property what portion, if any, of the Richmonds' camp encroached on the property of the Lawtons, nor did he testify as to this.

[¶ 12] Applying the principles governing the determination of a boundary when, as in the instant case, a latent ambiguity occurs in applying the description in a deed to the location of the property on the ground, we find no error in the trial court's factual determination as to the location of the disputed boundary.

[¶ 13] The Lawtons also contend that the trial court committed reversible error by admitting, over their objection, the testimony of Demo that he had pointed out the preliminary flag markers he had placed on the site to Virginia Richardson and that "she told me to stake the lots out and let her know, and she would get back to me if she had a problem with what was laid out." He stated that he had accordingly notified her, but she had never contacted him concerning the survey.

 [¶ 14] Because our review of the record discloses there is nothing in the decision of the trial court reflecting reliance on this testimony, we hold it is highly probable that the trial court's decision was not affected by the evidence. Accordingly, its admission was harmless error. *See* M.R.Civ.P. 61. ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect substantial rights of the parties."). *See also* M.R.Evid. 103 ("Error may not be predicated upon a ruling which admits evidence ... unless a substantial right of the party is affected...."); *In re Jason B.*, 552 A.2d 9, 10–11 (Me.1988) (if review of record discloses it highly probable trial court's decision not affected by hearsay evidence, admission harmless).

The entry is:

Judgment affirmed.

