2000 ME 212

**In re ASHLEY S.**

Supreme Judicial Court of Maine.

Submitted on Briefs Oct. 18, 2000.
Decided Dec. 14, 2000.

---

Verne E. Paradie Jr., Gosselin, Dubord & Rabasco, P.A., Lewiston, for appellant.

Andrew Ketterer, Attorney General, Carmen L. Coulombe, Asst. Attorney General, LaTonya Hayes, Asst. Attorney General, Nancy Henry, Asst. Attorney General, Matthew Pollack, Asst. Attorney General, Augusta, for appellee.

J. Lawrence Irwin, Lewiston, Guardian ad Litem.

David Veilleux, Lewiston, for mother.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] The father of Ashley S. appeals from the judgment of the District Court (Lewiston, *Gorman, J.*) finding Ashley to be in circumstances of jeopardy and awarding custody of Ashley to the Department of Human Services. 22 M.R.S.A. §§ 4035, 4036 (1992 & Supp.2000). The father does not challenge the court's jeopardy finding but contends that the court erred when it found that "aggravated circumstances" existed pursuant to 22 M.R.S.A. §§ 4002(1–B)(A)(1), 4036(1)(G–2) (Supp.2000) and that reunification efforts would be inconsistent with Ashley's permanency plan, 22 M.R.S.A. § 4041(2)(A–1) (Supp.2000). We affirm the judgment.

## I. BACKGROUND

[¶ 2] On December 13, 1999, the Department of Human Services filed a petition for child protection order concerning two-year-old Ashley, alleging that Ashley was in circumstances of jeopardy based on her parents' severe neglect, domestic violence, and mental health problems. The Department also sought a preliminary protection order allowing Ashley's immediate removal from her parents' home. The court granted the preliminary protection order, and the Department removed Ashley from her parents' care on the same date.

[¶ 3] The father waived his right to hearing on the preliminary protection order, and two months later, the court held hearings over the course of three days on the Department's petition for a protection order and its request for an order allowing the Department not to undertake reunification efforts. At trial, the father disputed only the Department's request to be relieved of its reunification obligations. The District Court found that Ashley was in circumstances of jeopardy, awarded custody of Ashley to the Department, and relieved the Department of its obligation to provide reunification services to the father.

[¶ 4] The facts relevant to the father's appeal can be summarized as follows.[1] On December 13, 1999, at approximately 1:13 in the afternoon, the Lewiston Police Department received a phone call from Ashley's mother indicating that her two-month-old son, Eric Jr., had died in his sleep. Upon arriving at the apartment, the two responding detectives found the baby's corpse and Ashley in a shockingly unsanitary and dangerous apartment.

[¶ 5] According to the investigating detectives, the apartment was in complete disarray, with dog excrement on the floor and garbage and trash piled everywhere. Although it was winter, the temperature

---

1. Because only the father appeals the court's judgment, the facts are recited to the extent that they are relevant to his appeal.

inside the apartment was unusually warm, later reported to be above eighty degrees; and the odor of feces, urine, body odor, animals, and decaying food was overwhelming. Cockroaches were observed in the vicinity of Ashley's room and little bugs were flying around the trash and crawling on the walls. In the bathroom, there were gnats, and the tub was filled with trash bags full of clothing and other items. Dirty dishes and rotting foods filled the kitchen area. In sum, the two investigating detectives, who had almost twenty years of experience between them, described the apartment as one of the worst they had seen in their law enforcement careers.

[¶ 6] The DHS caseworker who was called to the scene observed that the children's conditions reflected the shocking condition of the apartment and that Ashley looked and smelled as if she had not been bathed in days, if not weeks, and was dressed in clothes that were covered with feces.

I held her, and I immediately felt that her clothing was wet, so much that it had soaked through the arm that I was holding her by .... [W]hen we went to the police department, and upon takin[g] the clothes off of her, it was discovered that [the pants had] feces completely coating the inside, front and back .... It was very overwhelming .... [S]he had feces inside and outside of her stocking, shoes. It was all over—it was all over her body. In her hair.

According to Ashley's guardian ad litem, Ashley had to be "taken for medical treatment several times to try to determine why she was emitting a noticeable body odor even weeks after her removal from the [father's] home." Photographs and a video tape recording confirmed the testimony of the officers and the DHS caseworker.

[¶ 7] Ashley's baby brother, Eric Jr., had been dead for approximately eight to twelve hours when the officers arrived. The previous evening, Eric Jr. had been put to bed, still in his car seat, in a bassinet inside the parents' bedroom. He was dressed in sweatpants and sweatshirt, and completely covered with a blanket. According to the father, it was routine for the parents to place the blanket over the baby's face to keep his pacifier from falling out.

[¶ 8] Although it was typical for Eric Jr. to wake up one or more times during the night, he did not wake up that night. The next morning, when the mother left the apartment with Ashley's five-year-old stepsister, Katie, to run some errands, she did not feed or change the baby. From 7:30 A.M. until the mother's return just after 1:00 P.M., the father took no action to tend to Eric Jr. or Ashley's needs. Therefore, from approximately 11:00 P.M. until the next afternoon at 1:15 P.M., the two-month-old infant received no food, no care, and no attention whatsoever from his father. During those hours, Eric Jr. laid fully covered beneath a blanket in a sweltering apartment, right beside his father's bed, and died.[2] During the same period of time, Ashley was penned in a small room, covered in her own feces, unattended, and prevented from contact with her parents by a fence in the doorway of her room.

[¶ 9] An evaluation of the father, completed after the baby's death, disclosed that the father "seems to feel no responsibility for his son's death, and did not seem to think it out of line to allow a small child like his youngest daughter to languish for hours in her room behind a locked gate." Ultimately, the court found that the father's "failure to even notice that [his] child was dead is clear and convincing evidence of deprivation of supervision."

[¶ 10] In a detailed and thoughtful opinion, the court concluded that the father had subjected Ashley to "chronic abuse or any other treatment that is heinous or

---

**2.** The medical examiner testified that, although Sudden Infant Death Syndrome had been ruled out, the cause of death had not yet been established.

abhorrent to society" and that reunification efforts would be inconsistent with her permanency plan. In light of the evidence that the father had the financial resources and the skills necessary to provide a clean and safe environment for his children,[3] the court concluded that the father willfully and grossly neglected the needs of his children. In so concluding, the court granted the Department's request not to commence reunification efforts. The father filed a timely appeal of the court's order.

## II. DISCUSSION

■ [¶ 11] The father contends that the court erred when it concluded that his treatment of Ashley met the statutory definition of "aggravated circumstances," as defined in 22 M.R.S.A. § 4002(1–B)(A)(1), and that providing reunification services would be inconsistent with Ashley's permanency plan. 22 M.R.S.A. § 4041(2)(A–1).[4] Specifically, the father argues that the court erred in interpreting the term "treatment that is heinous or abhorrent to society" as applied to the facts before it. 22 M.R.S.A. § 4002(1–B)(A)(1). We review de novo the court's interpretation of the statute for errors of law, and review the court's application of the statutory language to the facts at issue for abuse of discretion. *See In re Heather C.*, 2000 ME 99, ¶ 26, 751 A.2d 448, 455; *In re Christmas C.*, 1998 ME 258, ¶ 3, 721 A.2d 629, 630.

[¶ 12] Ordinarily, when children are removed from their parents' custody, the Department is required to develop a rehabilitation and reunification plan designed to safely reunite the parents and children.

22 M.R.S.A. § 4041(1) (Supp.2000). Because families that enter the child protective system often suffer from a lack of resources, we have recognized the Department's role in this process as "important" in rehabilitating families for reunification. *See In re Daniel C.*, 480 A.2d 766, 769 (Me.1984). Without the Department's efforts in this regard, families may not receive the help they need to correct the circumstances that brought their children into the State's custody in the first instance. *See* 22 M.R.S.A. § 4003(3) (Supp. 2000). This aspect of the Department's responsibilities is even more crucial in light of the expedited timeframes recently enacted by the Legislature. 22 M.R.S.A. §§ 4038(1), 4052(2–A)(A) (Supp.2000).

[¶ 13] The Legislature has recognized, however, that under certain circumstances, children cannot be returned home safely within a reasonably calculated time, even if reunification services are provided. *See* 22 M.R.S.A. §§ 4002(1–B), 4041(2)(A–1); *In re Heather C.*, 2000 ME 99, ¶ 28, 751 A.2d at 456. Specifically, if the court finds the existence of an "aggravating factor," determines that continuation of reunification efforts is inconsistent with the permanency plan for the child, or if two placements of the child with the same parent have failed, the Department may be relieved of its reunification responsibilities. 22 M.R.S.A. § 4041(2)(A–1).

■ [¶ 14] The Legislature adopted the "aggravating factors" language as part of an Act designed to facilitate "expeditious actions in child protection cases" in compliance with the federal Adoption and Safe Families Act. Adoption and Safe Families Act of 1997, Pub.L. No. 105–89, 111 Stat.

---

**3.** The father received over $600 per month in Social Security benefits based on his temper disorder, and less than four months before Ashley was removed from his custody, he had received an additional $11,000 in retroactive benefits. The family supplemented his income with the mother's TANF benefits and income from her job. There also was testimony that the parents had previously been offered a full range of services in an unrelated

matter with the DHS and had demonstrated that they had the skills to maintain a clean and safe environment for their children.

**4.** The court need only find one of these grounds for relieving the Department of its reunification responsibilities. *In re Misty B.*, 2000 ME 67, ¶ 11, 749 A.2d 754, 757–58; 22 M.R.S.A. § 4041(2)(A–1) (Supp.2000).

2115 (codified as amended at 42 U.S.C. 671(a)(15)(D) (2000)); L.D. 2246, Summary (118th Legis.1998); *see also In re Heather C.*, 2000 ME 99, ¶ 27, 751 A.2d at 455–56.[5] Section 4002 defines "aggravating factors," and provides, in relevant part:

> **1–B. Aggravating factor.** "Aggravating factor" means any of the following circumstances with regard to the parent.
>
> **A.** The parent has subjected the child to aggravated circumstances including, but not limited to, the following:

5. Prior to the addition of the "aggravating factor" language in 1997, the Act permitted DHS to forego reunification efforts based upon several discretionary, statutorily defined grounds. 22 M.R.S.A. § 4041(2)(A) (1992), *repealed by* P.L.1997, ch. 715, § B–11. Section 4041(2), entitled "Determination of need to commence or discontinue rehabilitation and reunification efforts," provided, in relevant part:

> **A.** The department may either decide to not commence or to discontinue rehabilitation and reunification efforts with either parent or the court may order that rehabilitation and reunification efforts need not commence or that the department has no further responsibilities for rehabilitation and reunification with either parent when:
> (1) The parent is willing to consent to termination of parental rights;
> (2) The parent cannot be located;
> (3) The parent is unwilling or unable to rehabilitate and reunify with the child within a time which is reasonably calculated to meet the child's needs;
> (4) The parent has abandoned the child;
> (5) The parent has acted toward a child in a manner which is *heinous or abhorrent to society* or has failed to protect a child in a manner which is *heinous or abhorrent society*, without regard to the intent of the parent; or
> (6) The victim of any of the following crimes was a child for whom the parent was responsible or the victim was a child who was a member of a household lived in or frequented by the parent and the parent has been convicted of:
> (a) Murder;
> (b) Felony murder;
> (c) Manslaughter;
> (d) Aiding or soliciting suicide;
> (e) Aggravated assault;
> (f) Rape;
> (g) Gross sexual misconduct;
> (h) Sexual abuse of minors;
> (i) Incest;

> (1) Rape, gross sexual misconduct, gross sexual assault, sexual abuse, incest, aggravated assault, kidnapping, promotion of prostitution, abandonment, torture, chronic abuse or any other *treatment that is heinous or abhorrent to society;* or
>
> (2) Refusal for 6 months to comply with treatment required in a reunification plan.

22 M.R.S.A. § 4002(1–B)(A) (emphasis added).[6] If one of the "aggravating fac-

> (j) Kidnapping;
> (k) Promotion of prostitution; or
> (*l*) A comparable crime in another jurisdiction.
> *Id.* (emphasis added).

6. The Act also provides courts with the discretion to relieve the Department of its reunification efforts if the parent has been convicted of certain crimes and the victim was a child in the parent's household; the parental rights of the parent to the child's sibling have been terminated involuntarily; or the parent has abandoned the child. 22 M.R.S.A. § 4002(1–B) (Supp.2000). These provisions closely follow the language used in title 42, section 671 of the United States Code, which provides monetary assistance to states for expenditures related to "foster care and adoption assistance":

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—
> ....
> (15) provides that—
> ....
> (D) reasonable efforts [to preserve and reunify families] shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that—
> (i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definitions may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse);
> (ii) the parent has—
> (I) committed murder ... of another child of the parent;
> (II) committed voluntary manslaughter ... of another child of the parent;
> (III) aided or abetted ... to commit such [murder or voluntary manslaughter]; or
> (IV) committed a felony assault ...; or
> (iii) the parental rights of the parent to a sibling have been terminated involuntarily[.]

tors" is found, the court has the discretion to order the Department not to commence or to cease reunification efforts. *In re Christmas C.*, 1998 ME 258, ¶ 7, 721 A.2d at 631; 22 M.R.S.A. § 4036(1)(G-2). Thus, the Act gives courts the discretion to identify the most egregious cases, from early stages of the child protective process, thereby allowing the Department to move towards achieving children's permanency without providing fruitless reunification services. 22 M.R.S.A. §§ 4002(1-B)(A), 4036(1)(G-2), 4041(2)(A-1).

[¶ 15] The father contends that his actions cannot meet the statutory definition of "aggravated circumstances," because the statutory language encompasses only affirmative, criminal acts by a parent against a child. *See* 22 M.R.S.A. § 4002(1-B)(A)(1). Because he only grossly neglected his daughter, and because he was not convicted of any crime, the father contends that his actions, as a matter of law, cannot meet the statutory definition of "treatment that is heinous or abhorrent to society." *See id.*

[¶ 16] Contrary to the father's assertions, the plain language of the statute does not limit the statute's reach to only affirmative or criminal acts. *See Kimball v. Land Use Regulation Comm'n,* 2000 ME 20, ¶ 18, 745 A.2d 387, 392. The statute provides courts with discretion to find an "aggravating factor" when "[t]he parent *has subjected* the child to . . . treatment that is heinous or abhorrent to society."

22 M.R.S.A. § 4002(1-B)(A) (emphasis added).[7] The word "subjected" has the plain meaning to "subdue," "expose," or "cause to undergo or experience." WEBSTER'S II NEW RIVERSIDE DICTIONARY 671 (Office Ed.1996). Parental treatment of a child that merely *exposes* the child to "heinous or abhorrent" circumstances may meet the statutory definition of an "aggravated circumstance." 22 M.R.S.A. § 4002(1-B)(A)(1). When a parent's treatment of a child exposes that child to heinous or abhorrent circumstances, the court may consider those circumstances, regardless of whether the parent placed the child in harm's way through action or inaction; it is not necessary that the parent be found to have somehow assaulted or otherwise affirmatively abused the child. It is necessary, however, that the parent's behavior fall far outside the norm of ordinary, fallible parental behavior.[8]

[¶ 17] Neglect, that is, the failure to undertake the necessary and appropriate actions to keep children safe and well cared for, will rarely constitute the heinous or abhorrent treatment envisioned by the Legislature. There can be no question, however, that the severe neglect to which the father subjected Ashley and her infant brother was abhorrent. The children were ignored for hours, if not for days, in a shockingly unsanitary environment. They sat in their own excrement, unattended, unfed, and unwashed. They received no

42 U.S.C.A. § 671 (West 2000).

7. The laws of most states, pursuant to the Adoption and Safe Families Act of 1997, contain the "aggravated circumstances" language. Because Congress left it to the states to define what "aggravated circumstances" means, a wide variety of approaches has been found among the states. *See, e.g.,* CONN. GEN. STAT. ANN. § 17a-111b(a) (West 2000); IOWA CODE ANN. § 232.102(12) (West 2000); NEB. REV. STAT. ANN. § 43-282.01(4) (Michie 2000); 42 PA. CONS. STAT. § 6302 (2000); W. VA. CODE ANN. § 49-6-5(a)(7)(A) (Michie 2000).

8. Although the Legislature has not defined "heinous or abhorrent to society," our interpretation of that phrase is guided, in part, by

the legislative history of this language. In 1985, the Legislature first added the phrase "heinous or abhorrent to society" to the Act and stated, in relevant part:

It is the intent of the Legislature that the court shall determine what circumstance constitutes a heinous or abhorrent parental act or failure to act. The Legislature intends the court to use its best judgment in making this determination according to generally accepted standards and mores of performance, behavior and responsibility in this culture; particularly in regard to the performance, behavior and responsibility of parents toward their children . . . .

P.L.1985, ch. 739, § 18.

human contact for hours on end. Ashley was penned into a secluded room, where she could be ignored completely by her father. Such gross disdain for the needs of the children falls so far outside the behavior expected of ordinary fallible parents as to be undeniably abhorrent.

[¶ 18] Moreover, this was not the first time that Ashley had been subjected to such abject neglect. In 1998, when Ashley and Katie were living with the mother and father in another apartment in Lewiston, the Department responded to a referral indicating similar problems of serious neglect as well as a violent and abusive environment. The guardian ad litem reported that the case was eventually closed after Skill Builders praised the work that the parents had done. As noted in the guardian's report, however, the parents ceased making any efforts as soon as the Department stopped monitoring their care of the girls. A pattern emerged of parents who cleaned their home temporarily for the authorities, while in reality, they did nothing to improve the lives of their children. The record also confirms that whenever the parents moved, which they did frequently,[9] they quickly turned their new living quarters into shambles.

[¶ 19] The court recognized the importance of placing the extraordinary neglect demonstrated on the day of the baby's death into context before determining whether to grant the Department's request that no further efforts at rehabilitation be made with the father. Specifically, the court found the following:

> As horrifying as the conditions in that apartment were, they must be seen in the context. If [these] were first time parents with no resources, and no training, the apartment would have been no less appalling but, perhaps, not the basis for a cease reunification order. However, these parties had a full range of opportunities offered to them during their previous involvement with DHS. In addition, although not wealthy by any stretch of imagination, [the parents] had many more resources available to them than many families in this area.

[¶ 20] In sum, the evidence of unconscionable neglect by a parent who has access to his own resources, has had the benefit of rehabilitation resources, and has, nonetheless, chosen to wholly ignore his children's needs, is fully sufficient to support the court's findings that the father's treatment of Ashley was "heinous or abhorrent to society" and that the Department should be relieved of its reunification responsibilities.

■ [¶ 21] We also reject the father's argument that the Legislature only intended criminal acts to be included as an "aggravated circumstance." *See* 22 M.R.S.A. § 4003 (1992 & Supp.2000). The plain language of the statute specifies that the list of enumerated acts is not an exclusive list. 22 M.R.S.A. § 4002(1–B)(A) ("... including, but not limited to, the following ...."). By using the "but not limited to" language, the Legislature intended courts to determine what constitutes "aggravated circumstances" depending on the circumstances. *Id.* Although the statute references several criminal acts as illustrative of "aggravated circumstances," it also references other acts—abandonment, torture, and chronic abuse—which are not explicitly crimes. *Id.* Its inclusion of the final phrase, "other *treatment* that is heinous or abhorrent to society," evidences its inclusion of unprosecuted conduct. *See id.*[10] The statute plainly anticipates that certain acts, even when those acts do not result in a criminal prosecution, may meet the definition of "aggravated circumstances." *See In re Heather C.,* 2000 ME 99, ¶¶ 25–26, 751

---

9. The parents had moved approximately eighteen times by the time Katie was six years old.

10. It is also instructive that the "heinous or abhorrent" language was once part of a separate paragraph, unrelated to the list of crimes, but was consolidated with an abbreviated list of crimes when the Legislature enacted subsection 4002(1–B)(A) in 1997.

A.2d at 455. The extraordinary neglect to which Ashley and her infant brother were subjected falls within that definition.

[¶ 22] Accordingly, applying the statutory definition to the facts at hand, we conclude that the District Court did not err in its interpretation of the statute nor exceed the bounds of its discretion when it found that the father's treatment of Ashley amounted to "treatment that is heinous or abhorrent to society." *See id.*[11] Moreover, contrary to the father's assertions, there was sufficient competent evidence in the record to support the District Court's factual findings.

The entry is:

Judgment affirmed.

---

11.  For the same reasons, the court did not err when it found that reunification efforts would be inconsistent with Ashley's permanency plan. 22 M.R.S.A. § 4041(2)(A–1).