2001 ME 114

**In re SCOTT S. et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs: May 25, 2001.
Decided: July 19, 2001.

Stephen C. Whiting, Esq., Portland, for appellants.

G. Steven Rowe, Attorney General, Matthew Pollack, Asst. Attorney General, Nancy Henry, Asst. Attorney General, Augusta, for appellee.

Tracy Phillips, CASA, Durham, Guardian ad Litem.

1. Scott has a different father.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] The mother and father appeal from the judgment of the District Court (Lewiston, *Beliveau, J.*) terminating the mother's parental rights to Scott S. and terminating both parents rights to Kaleb C.[1] The parents contend, among other things, that the District Court erred (1) in giving the determination of the best interests of the children precedence over the determination of parental unfitness under 22 M.R.S.A. § 4055(1)(B)(2)(b) (1992), and (2) in considering the findings of fact and conclusions of law made by another judge in prior hearings regarding this matter. Because we conclude that the court erred in holding that its determination regarding the best interests of the children took precedence over considerations of parental capacity, and that the error was not harmless as to Kaleb, we vacate the judgment in part and affirm in part.

## I. BACKGROUND

[¶ 2] The mother of Scott and Kaleb is married to Kaleb's father. Scott's biological father opposed termination of his parental rights but has not appealed from the court's decision to terminate his parental rights to Scott.

[¶ 3] The mother and father were married in 1998 when Scott was three years old. When Scott was almost four, the mother gave birth to Kaleb. Approximately two weeks after Kaleb was born, the mother called the Department of Human Services and said that she could not take care of her children any longer, particularly Scott. She admitted hitting him

and telling him that she was going to give him up for adoption. The mother also admitted that she had physically abused Scott and her husband[2] and that she was in no condition to care for her newborn child, Kaleb. The mother was then hospitalized for psychiatric reasons. At the time of hospitalization, she said that she did not want her children and that she was afraid she was going to hurt them.

[¶ 4] The Department filed a petition for a child protection order, but did not seek to have the children immediately removed from the home. Instead, the Department urged the father to assume responsibility for the children's care. The caseworker arranged for day care for the children and parenting assistance for both parents. Although the father had considered himself a "traditional father" and believed that it was his wife's responsibility to take care of the children, he agreed to take care of the children when they returned from day care and to continue as their primary caretaker. He also agreed to be responsible for ensuring that his wife would have no unsupervised contact with the children until the Department felt that she was emotionally and mentally stable enough to return home and be with the children.

[¶ 5] In the days leading to the jeopardy hearing, the father struggled to take care of the children and was not always successful. The guardian observed that when she visited the home, it was uncared for, with "stuff" covering the stove top, the sink filled with dirty dishes and soured

food, open containers of food, cat feces overflowing the litter box, an open third floor window with the children leaning out, and prescription medication on a nightstand where the children could easily get hold of it. In addition, the father allowed the mother to be alone with the children after she left the hospital.

[¶ 6] After a contested hearing, the District Court (*Gorman, J.*) entered a judgment finding the children to be in jeopardy and concluding that the mother possessed "deficits in her knowledge of child development and her ability to care for children." The court also took into consideration the mother's statement that she would hurt the children if they remained in her care.[3] As to the father, the court found that his failure to protect the children and himself from the mother's behavior had placed Scott and Kaleb in circumstances of jeopardy. The court also found that marital discord between the parents jeopardized the children. The court ordered that the children be placed in the custody of the Department. The Department placed the boys with their day care provider.

[¶ 7] In its jeopardy order, the court required that both the mother and father follow the recommendations of their psychological evaluations and participate in counseling and parenting classes. The plan developed by the Department anticipated that the father would need preparation to become the children's primary caretaker.[4] The plan further provided that the mother and father would continue in indi-

2. The mother was arrested by the Lewiston Police Department for assaulting her husband. It is not clear from the record how the charges were resolved.

3. The record reflects that, as a child, the mother was violently and repeatedly sexually abused by her father. She suffers from post-traumatic stress disorder, dependent personality disorder, and postpartum affective difficulties. Her behavior becomes increasingly

unpredictable and her judgment becomes poor in times of stress.

4. The father does not suffer from any psychopathological problems, but he lacks basic knowledge concerning child development, and he has felt overwhelmed with the task of parenting. He ascribes to "traditional family roles in which the mother is the primary (day-to-day) parenting figure for the children while the father assumes the role of being the pro-

vidual therapy, that they would continue in parenting education and couple's counseling, that the father would continue supervised visitation in the foster parent's home as long as it was in the best interests of the children, and that the mother would continue supervised visitation at the Department as long as it was in the children's best interests.

[¶ 8] After a judicial review and permanency planning hearing held on January 14, 2000,[5] the court found that the Department had made reasonable efforts to rehabilitate and reunify the family, but that the children continue to be in need of a child protection order. The parties agreed that Scott and Kaleb would remain in the custody of the Department and that efforts would be made to reunify Kaleb with his parents and reunify Scott with his mother as long as his stepfather remains in the household.

[¶ 9] The Department filed a petition for termination of the mother's parental rights to Scott and Kaleb and the father's parental rights to Kaleb on May 10, 2000.[6] The petition alleged that the mother had not been able to progress in treatment and that she would not likely ever be able to care for her children. The Department also alleged that the father had made only minimal progress and that he believed that

his wife did not have any problems that would keep her from being able to parent the children. After a contested hearing, the District Court entered an order terminating both parents' parental rights. The court first found that termination of parental rights would serve the best interests of the children. Regarding the mother, the court found that she is unable to meet her children's needs within a reasonable time and that she is unable to protect the children from jeopardy. As for the father, the court found that he is unwilling and unable to protect Kaleb from jeopardy.[7] This appeal followed.

## II. DISCUSSION

██ [¶ 10] We review the District Court's findings of fact to determine whether they are clearly erroneous, and we review de novo the conclusions of law for clear error. *In re Ashley S.*, 2000 ME 212, ¶ 11, 762 A.2d 941, 945; *In re Christina H.*, 618 A.2d 228, 229 (Me.1992). "Deference is paid to that court's superior perspective for evaluating the weight and credibility of evidence." *In re Leona T.*, 609 A.2d 1157, 1158 (Me.1992).

### A. Judicial Notice of Prior Findings of Fact and Conclusion of Law

[¶ 11] We first address the parents' contention that the court should not have

---

vider as well as family leader." The father has strong religious beliefs and has testified to his belief that his wife is a paradigm of motherhood and that God will take care of everything.

5. Judge Gorman presided over this hearing as well.

6. Shortly after the first day of hearings on the petition to terminate parental rights involving Scott and Kaleb, the mother gave birth to a third son, Philip. The mother's husband, Kaleb's father, is the biological father of Philip. The Department immediately filed a petition for child protection order, and took Philip into custody. The case. *In re Philip C.*, PC-

00–040, is separate from the one before us. After a contested preliminary hearing on August 3, 2000, the court concluded that Philip was in immediate risk of harm and in need of a child protective order. The court ordered that the child remain in the custody of the Department and that the parents continue to follow the original service plan pending the outcome of this termination hearing.

7. The court found that the father "has not complied with the services by refusing to accept the fact and conclusion that [his wife] cannot care for her children without the implementation of extensive and long term services."

considered the findings of fact and conclusions of law previously entered by a different judge at the jeopardy and judicial review hearings. The parents argue that because the judge "could not consider the evidence presented at those former hearings, he also could not consider the findings of fact and conclusions of law reached at those prior hearings." [8]

[¶ 12] That contention is simply wrong. The authority of the trial judge to take judicial notice of matters of record is distinct from the authority of a single judge to consider *evidence presented* in a previous stage of a child protective proceeding when that evidence was presented to the same trial judge. *See In re Heather C.*, 2000 ME 99, ¶ 6, 751 A.2d 448, 451; *Finn v. Lipman*, 526 A.2d 1380, 1381 (Me. 1987); *see also In re Michael A.*, 552 A.2d 368, 369–70 (R.I.1989). When the trial judge has actually heard the evidence presented in prior stages of a child protection proceeding, that judge may consider the evidence in the following stages because the process is, in fact, a unified proceeding. *In re Leona T.*, 642 A.2d 166, 168 (Me. 1994); *In re David W.*, 568 A.2d 513, 515 (Me.1990).[9] When a different trial judge presides at a later stage of the process, that trial judge may not rely on the *evidence* presented to the prior judge, but may consider and rely on the findings of fact and conclusions of law contained in the orders or judgments entered by the prior judge.

[¶ 13] When a court enters a judgment containing findings of fact and conclusions of law, those findings become a matter of judicial record. A judge may take judicial notice of any matter of record when that matter is relevant to the proceedings at hand.[10] Particularly in the context of child protective proceedings, where the entire procedure occurs as a unified proceeding, *see In re Leona T.*, 642 A.2d at 168, a trial judge may, at any stage of the proceeding, take judicial notice of the findings and conclusions contained in any prior judgments or orders. *In re Heather C.*, 2000 ME 99, ¶ 6, 751 A.2d at 451.

[¶ 14] Because of the shifting burdens of proof in these unique proceedings, however, a cautionary note is important. Although the proceedings in child protective matters are unified, the burden of proof is more stringent at the termination of parental rights stage. *See Santosky v. Kramer*, 455 U.S. 745, 769–70, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The Department's burden at most stages is to prove the necessary elements by a preponderance of the evidence. *See* 22 M.R.S.A. § 4035 (1992 & Supp.2000) (requiring a preponderance of the evidence standard in jeopardy hearings); *In re Christmas C.*, 1998 ME 258, ¶ 7, 721 A.2d 629, 631 (holding that cease reunification orders require the preponderance of the evidence standard). In contrast, the court may not terminate a parent's rights unless it is persuaded by clear and convincing evidence that the Department has met its burden. 22 M.R.S.A. § 4055 (1992 & Supp.2000); *see also Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. The trial court must,

---

8. Whenever possible, it is best that a single judge hear all stages of the child protection proceedings related to a family. Here, Judge Gorman was appointed to the Superior Court after presiding at the earlier stages of this matter and was no longer available to conduct the termination proceedings regarding Scott and Kaleb.

9. *See also In re Charles G.*, 763 A.2d 1163, 2001 ME 3, ¶ 4. 763 A.2d 1163, 1165 (citing *In re Leona T.*, 642 A.2d 166, 168 (Me.1994)); *In re Heather C.*, 751 A.2d 448, 2000 ME 99, ¶ 6. 751 A.2d 448, 451 (citing *In re David W.*, 568 A.2d 513, 515 (Me.1990)).

10. An exception exists when the judgment at issue has been vacated on appeal.

therefore, be vigilant in requiring that the evidence offered in support of a petition to terminate parental rights is clear and convincing. Thus, although the court may take judicial notice of prior findings in a termination proceeding, it must independently assess all facts presented and must be confident to a clear and convincing standard that the evidence taken as a whole is sufficient to meet the strict statutory prerequisites for terminating parental rights. *See Taylor v. Comm'r of Mental Health & Mental Retardation,* 481 A.2d 139, 153 (Me.1984) (defining the clear and convincing evidence standard to require that the fact-finder find the operative factual conclusion to be "highly probable").

[¶ 15] Here, the court heard a significant amount of evidence regarding the mother's continuing inability to protect Scott and Kaleb from jeopardy and her inability to take responsibility for her children within a time which is reasonably calculated to meet their needs. That evidence related to events that occurred after the jeopardy order was entered. The court did not rely on the original findings, instead it had before it new evidence of the parents' abilities. The Department also presented current evidence of the father's inability to protect Kaleb from jeopardy and his unwillingness to believe that his wife presented a threat to the children. Indeed, the hearing focused, as it should, not on the original reason for the children's removal from the parents' home, but on the parents' actions since that time and their ability, contemporaneous with the termination hearing and into the future, to provide safe care for the boys.

[¶ 16] Thus, it was not error for the trial judge to take judicial notice of the prior judge's findings in order to understand the context of the parties' positions at the termination hearing.[11]

### B. The Role of the Best Interest Determination in Termination Proceedings

[¶ 17] We next address the parents' contention that the District Court erred in its consideration of the best interests of the children. In its written opinion, the court commented on the best interests of the children before addressing the parental capacity factors. We have not previously found error on the sole basis that the court made best interests findings before making parental capacity findings.

[¶ 18] Here, however, the court's analysis goes beyond such a scrivener's error. The court held that it "must find by clear and convincing evidence that termination is *first,* in the best interest of the child and that one or more of the socalled [sic] four fault factors are present and have been proven under said standard. . . . The best interest factor *takes precedence* over the fault factors under existing law as amended a few years ago." (Emphasis added.) Thus, the court did not merely recite its factual findings in the order set out in the statute; it concluded that the best interest factor was the paramount factor in determining whether to sever the parents' rights.

[¶ 19] Although the Legislature has placed the best interest factor numerically prior to the parental unfitness factors enumerated in section 4055, we have held that the District Court must first find that the State has met its burden of proving parental unfitness under one of the four prongs of 22 M.R.S.A. § 4055(1)(B)(2)(b) before it can consider the best interests of the children. *In re Melanie S.,* 1998 ME 132, ¶ 5, 712 A.2d 1036, 1037; *In re Ashley A.,* 679 A.2d 86, 89 (Me.1996); *In re Leona T.,* 609 A.2d at 1158–59. Specifically, we have held that " '[n]otwithstanding the se-

---

11. The parents also contend that the court erred when it referred in the judgment to a separately docketed case involving their youngest child, Philip. We find no error.

quence in the statute, the trial court must find, by clear and convincing evidence, one of the four bases of parental fitness ... before it may consider the best interests of the child.'" *In re Melanie S.*, 1998 ME 132, ¶ 5, 712 A.2d at 1037 (citation omitted). If the court finds that the Department has not met its burden of demonstrating lack of parental capacity, it does not reach the best interest analysis at all. *See In re Leona T.*, 609 A.2d at 1158–59 (concluding that the court erred in reaching the best interest factor when it had found that the Department failed to sustain its burden of proof regarding parental fitness); *see also Rideout v. Riendeau*, 2000 ME 198, ¶ 23, 761 A.2d 291, 301 n. 15. Only if the court has concluded that the Department has proved one or more of the parental unfitness factors does it ever reach the best interest determination.

■ [¶ 20] Our holding on this issue is not based on mere semantics. Rather, it springs from the mandates of the federal and state constitutions. Because of the fundamental importance of parents' rights to raise and nurture their children, the State may not interfere with those rights absent compelling overriding interests.[12] Accordingly, except in the context of a dispute between the parents in a divorce or a similar proceeding,[13] the State may not remove children from a parent's care solely on the basis of the best interests of the children. *Troxel v. Granville*, 530 U.S. 57, 68–69, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Rideout*, 2000 ME 198, ¶ 23, 761 A.2d at 301 & n. 15; *In re Leona T.*, 609 A.2d at 1158. The words of Justice Stewart articulate this concept best: "If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, I should have little doubt that the State would have intruded impermissibly on 'the private realm of family life which the state cannot enter.'" *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring) (citation omitted).

■ [¶ 21] Thus, in termination of parental rights proceedings, the court's focus must be on the Department's allegations of parental unfitness. Only if the court is convinced that the State has proven one or more of the factors demonstrating that the parents cannot safely provide care for their children does the court consider the children's best interests. The result is that, although the best interest factor alone may prevent the termination of parental rights, it will never, standing alone, be a basis for a termination.[14]

---

12. There can be no question that both the Maine and federal constitutions recognize a fundamental and important right of parents to the care, custody, and control of their children. *See, e.g., Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Rideout v. Riendeau*, 2000 ME 198, ¶ 12, 761 A.2d 291, 297. "[T]he interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65, 120 S.Ct. 2054.

13. The best interest standard is primarily used in judicial proceedings where equal or similar rights of parties must be balanced.

*Cf. Troxel*, 530 U.S. at 67, 120 S.Ct. 2054; *Rideout*, 2000 ME 198, ¶ 12, 761 A.2d at 297.

14. This does not mean that the facts relating to the children's needs should not be considered in determining the parents' capacity to care for them. To the contrary, the parents' actions and abilities must be understood and judged in the context of the health, ages, and needs of the children. It is important, however, to distinguish between the children's best interests and their needs. Although the needs of the children cannot be disentangled from determinations of parental fitness, the best interests of the children must be. It may be in the "best interests" of a child to be raised in a home with richer, smarter, or more so-

**[¶ 22]** Here, the court expressly stated that the best interests of the children "takes precedence" over parental capacity or unfitness findings. That holding constituted clear error. We must determine whether the error was harmless.

## C. The Harmless Error Standard

**[¶ 23]** Because we have not had occasion to address the harmless error standard in detail in the context of child protective proceedings, we take this opportunity to do so.[15] We must first determine whether there is any meaningful distinction between the civil, criminal, and constitutional standards of review regarding error which may have been harmless, and if so, which standard should be applied in child protective cases.[16]

**[¶ 24]** The rules defining ordinary harmless error do not vary significantly in civil and criminal proceedings. In civil proceedings, "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the *substantial rights* of the parties." M.R. Civ. P. 61 (emphasis added); *accord Midland Fiberglass, Inc. v. L.M. Smith Corp.*, 581 A.2d 402, 403 (Me.1990) (holding that an error is harmless if the Court believes that it is highly probable that the error did not affect the judgment). In criminal proceedings, "[a]ny error, defect, irregularity or variance which does not affect *substantial rights* shall be disregarded." M.R.Crim. P. 52(a) (emphasis added); *accord State v. DeMass*, 2000 ME 4, ¶ 17, 743 A.2d 233, 237 ("Error is harmless when it is highly probable that it did not affect the jury's verdict.").

**[¶ 25]** Accordingly, we have held that in civil matters, the reviewing court must be convinced that it is highly probable that the error did not affect those substantial rights. *In re Elijah R.*, 620 A.2d 282, 285 (Me.1993) (holding that the admission of hearsay evidence is harmless error because "it is highly probable that admission of the evidence did not affect the judgment"). Similarly, in criminal matters, we have also required the conclusion that it is highly probable that the error did not affect substantial rights, *see State v. Phillipo*, 623 A.2d 1265, 1268 (Me.1993), and any doubt must be resolved in favor of the defendant, *see O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Therefore, we have not articulated any significant distinction between the level of certainty the reviewing court must afford when reviewing a claim of harmless error in civil and criminal cases.

---

cially adept parents. That is not, however, and cannot be, a basis for removing children from their families.

**15.** *Cf. In re Elijah R.*, 620 A.2d 282, 285 (Me.1993); *In re Jason B.*, 552 A.2d 9, 10 (Me.1988).

**16.** Child protection proceedings do not fit neatly into either the civil or criminal category. The proceedings appear on their face to be civil. The goal of the Child Protection Act is to guard the safety of children, not to punish parents. It is crafted in terms of protecting children at risk of harm rather than accusing parents of wrongdoing or finding "fault" with the parents. The focus is remedial, not punitive. Consistent with that focus, the proceedings are treated administratively as civil, rather than criminal, in nature. On the other hand, the fundamental rights at stake in child protection proceedings are similar to the important rights at stake in criminal proceedings. The gravity of the State's intervention into the family's life is similar to the potential deprivation of liberty in criminal proceedings, particularly in matters relating to the termination of parental rights. Also similar to criminal proceedings, the State has significant resources that may be brought to bear against parents thought to create a risk of harm to their children. In recognition of the serious nature of the proceedings, the Legislature has assured that parents will be represented by counsel at all significant stages of the judicial proceedings. 22 M.R.S.A. § 4005(2) (1992).

[¶ 26] When the error in a criminal proceeding is of constitutional dimension, however, a heightened degree of certainty has been required by the United States Supreme Court. The Court addressed the harmless error standard in the context of a claimed federal constitutional error in a criminal matter in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Chapman*, the Court rejected the petitioners' argument that any federal constitutional error must result in an automatic reversal of the judgment, thus establishing that even constitutional error may be harmless.[17] *Chapman*, 386 U.S. at 21–22, 87 S.Ct. 824.

[¶ 27] The Court nevertheless held that the party asserting the harmlessness of the error has the burden of persuading the reviewing court that the error did not affect the substantial rights of the complaining party and that it must demonstrate "beyond a reasonable doubt" that the error did not contribute to the result in the case. *Id.* at 24, 87 S.Ct. 824. The Court concluded that the level of appellate court confidence articulated in that standard contained "little, if any, difference" from the standard earlier announced in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). *Chapman*, 386 U.S. at 24, 87 S.Ct. 824. There, the Court had framed the question as: "whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction." *Fahy*, 375 U.S. at 86–87, 84 S.Ct. 229. Refashioning that standard to "beyond a reasonable doubt" in *Chapman*, the Court noted that although "appellate courts do not ordinarily have the original task of applying such a test, ... it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824 (footnote omitted). In adopting the "beyond a reasonable doubt" standard for review of the harmlessness of federal constitutional errors, the Court utilized the same standard by which fact-finders in criminal matters must be convinced of the accused's guilt.

[¶ 28] The Supreme Court has not had occasion to address a standard for review of constitutional errors in child protective proceedings. It has, however, required a significant level of certainty on the part of the fact-finder. In *Santosky*, the Court balanced the competing interests of the parties and concluded that states may not permanently deprive a parent of rights to a child without evidence that is clear and convincing. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. Recognizing the important state interests in the safety of children, however, it declined to mandate the higher standard of proof of "beyond a reasonable doubt," leaving states free to undertake their own assessment of the standard to be required. *Id.* at 769–70, 102 S.Ct. 1388. Maine's Legislature chose to impose a clear and convincing standard, thereby requiring the fact-finder to be convinced that it is "highly probable" that the operative facts exist as the State alleges. *See* 22 M.R.S.A. § 4055; *see also Taylor*, 481 A.2d at 153. We conclude that the same standard should be applied to alleged error in these matters, even when the error is of constitutional magnitude.

[¶ 29] Applying these concepts, we hold that, in the context of a termination of parental rights proceeding, if the court errs, whether or not that error can be framed in terms of a constitutional violation, the State has the burden of persuad-

---

17. We have similarly recognized that constitutional error may be harmless in criminal cases. "Pursuant to the harmless error analysis we review the entire record as a whole and ignore errors that are harmless, even some constitutional violations." *State v. York*, 1997 ME 156, ¶ 11, 705 A.2d 692, 695.

ing us that it is highly probable that the error did not prejudice the parents or contribute to the result in the case. The State's burden of persuasion is high. Any doubt will be resolved in favor of the parent.

 [¶ 30] Thus, when an error has occurred in a termination of parental rights proceeding, and the party alleging the error has preserved his or her objection to the error, we review the entire record to determine whether the error prejudiced the parents in the presentation of their case or had the potential to affect the outcome of the case. In the absence of substantial certainty, that is, a determination that it is highly probable, that the error had no prejudicial effect and did not affect the outcome, we will vacate the judgment.

D. Application of Harmless Error Standard

 [¶ 31] Here, the parents were not prejudiced in the presentation of their case. The court applied the law, in error, to the facts *after* the parties had presented their case in full. Nothing the court did compromised their opportunity for a full and fair hearing on the merits of the State's allegations.[18]

 [¶ 32] We look then to the parents' claim that the court's error in legal analysis may have affected its final conclusions on the pending petition for termination of parental rights. The record reflects, without doubt, the continuing inability of the mother to parent her children. Despite extensive services, including psychological treatment and "hours of parental education," the mother's history of personal trauma has prevented her from progressing in her efforts to change. Her emotion-

al maturity has been stunted to approximately twelve years of age. Her volatility, resulting in screaming and violence with the children and other adults, has not improved. She does not understand basic children's needs and has never developed an ability to be affectionate with her own children. The record demonstrates no reasonable prospective ability on the mother's part to be a safe parent for her boys. Because no other conclusion was possible, we are persuaded that it is highly probable that the error did not affect the court's judgment regarding the mother.

 [¶ 33] Regarding the father, however, we are not able to determine that it is highly probable that the court would have terminated his parental rights in the absence of its misunderstanding regarding the role of the best interest factor. The father testified that he was beginning to understand the need to protect the children from his wife, that he would now abide by the requirements that he not allow her to be alone with the children, and that he would try to be less rigid in viewing the limitations on his own responsibilities as a father. Also contrasting with the evidence of the father's lack of progress was his testimony that he would enlist the aid of friends and family to help him supervise his wife if the children were with him, that he would abide by the Department's other recommendations, and that he was apparently successful in caring for his eight-year-old son by another marriage every other weekend.

[¶ 34] Although the court may have, in the absence of the error, rejected the father's last minute assertions and concluded that he continued to lack the ability to care for the children himself, on this record, we

---

18. A limited class of constitutional errors, sometimes referred to as structural errors, defy analysis by harmless error standards and require reversal without regard to their effect on the outcome of the case. *See Neder v. United States*, 527 U.S. 1, 34–35, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). No such error is extant here.

cannot say that it is highly probable that the court's use of the best interest factor did not affect its conclusions regarding the father's fitness as a parent.

[¶ 35] It is the trial court's role to weigh and credit the evidence before it. Because it is possible that the court would reach a different conclusion regarding parental fitness on remand, we should not usurp the trial court's role. Thus, we must vacate the judgment regarding the father's son, Kaleb. Because, upon further review, it is possible that the court could conclude that the father is capable of safely parenting Kaleb, thus eliminating the need for foster care or adoption, we also vacate the judgment terminating the mother's parental rights to Kaleb.

[¶ 36] Finally, we note the urgency of finality in this matter. The children have been in a preadoptive foster placement since August of 1999. Kaleb, who is now two years old, has been in that home since he was five months old. The record reflects that the parents have not had the boys with them for a full day since they were placed in care. Time is of the essence. Upon remand, the court shall hear argument on an expedited basis and may, in its discretion, open the record for presentation of new evidence. In the event of further appeal, an expedited briefing schedule may be established.

The entry is:

Judgment as to Scott S. affirmed. Judgment regarding Kaleb C. vacated. Remanded to the same trial judge for further proceedings consistent with this opinion.

ALEXANDER, J., with whom CLIFFORD, J., joins, dissenting.

[¶ 37] I concur with the Court that the termination hearing judge properly considered the findings and conclusions entered by other judges at earlier stages of this proceeding. I also concur with the Court that the termination hearing judge erred

in interpreting 22 M.R.S.A. § 4055 to require that: "The best interest factor takes precedence over the fault factors ...." However, I do not agree with the Court that, in this case, the trial court's misallocation of the order of factfinding requires that the termination decision be vacated. Therefore, I respectfully dissent.

[¶ 38] Based on the findings made by the trial court regarding the parental unfitness prerequisites for termination, which were supported by clear and convincing evidence, there is no way that we can conclude that the trial court's result was "inconsistent with substantial justice" under the civil standard, M.R. Civ. P. 61, or that the trial court's misordering of the findings affected "substantial rights" under the criminal standard. M.R.Crim.P. 52(a).

[¶ 39] Our precedent applying the harmless error standard in both civil and criminal cases is not significantly different. For civil cases, error is harmless if it is highly probable that the error did not affect the judgment. *Lawton v. Richmond,* 1997 ME 34, ¶ 14, 690 A.2d 953, 956; *Midland Fiberglass, Inc. v. L.M. Smith Corp.,* 581 A.2d 402, 403 (Me.1990). For criminal cases, "error is harmless when it is highly probable that it did not affect the jury's verdict." *State v. DeMass,* 2000 ME 4, ¶ 17, 743 A.2d 233, 237. We have also said that error is not harmless if a "substantial right" of the party is affected. *State v. Phillipo,* 623 A.2d 1265, 1268 (Me.1993). To determine if error is harmless, we review the whole record of the case. *See State v. York,* 1997 ME 156, ¶ 11, 705 A.2d 692, 695.

[¶ 40] The termination hearing judge's misallocation of the order of factfinding, an allocation invited by the order for findings set in section 4055 itself, must be examined in the context of the whole record of this case and the termination hearing judge's extensive decision. The entire paragraph of the decision, where the trial court

opined that "the best interest factor takes precedence," reads as follows:

> The best interest factor takes precedence over the fault factors under existing law as amended a few years ago. Obviously the court must find that in addition to the best interests factor, there must be clear and convincing evidence that the parent or parents are unwilling or unable to protect the child from jeopardy within a reasonable time that meets the children's needs or that the parent or parents are unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs; or the parent has failed to make a good faith effort to rehabilitate and reunify with the child pursuant to section 4041 of T22.

[¶ 41] From this paragraph, it is apparent that, despite stating that best interest "takes precedence," the trial court acknowledged that, as a prerequisite to termination of parental rights, the trial court was required to find parental unfitness by clear and convincing evidence. With the necessity for finding parental unfitness by clear and convincing evidence acknowledged, the trial court then proceeded to find the mother an unfit parent. The Court agrees that this finding was appropriate with regard to the mother and not a basis to vacate, even if the order of findings was misplaced.

[¶ 42] Regarding the father's fitness, the trial court, after addressing best interests, made the following findings:

> This court further concludes that [the father] is both unwilling and unable to protect his child from jeopardy even to

this day. The evidence is clear and convincing concerning this conclusion as well. The Department has provided an abundance of services to [the father] as it did with [the mother] in an effort to reunify and rehabilitate [the father]. He has not complied with the services by refusing to accept the fact and conclusion that [the mother] cannot care for her children without the implementation of extensive and long term services. The child Kaleb cannot wait for his father to come around and become realistic. He still insists that [the mother] can parent his child. Time is of the essence.

This is a finding of parental unfitness consistent with the terms of 22 M.R.S.A. § 4055(1)(B)(2)(b)(i).

[¶ 43] The record developed from the Department's year and a half involvement with the parents, including findings by another judge at an earlier stage of the proceeding,[19] provides virtually undisputed support[20] for the trial judge's findings. From the Department's initial involvement with the family in April 1999, significant efforts were made through many caseworkers and counselors to get the father to realistically understand the mother's problems and to take leadership in parenting the children and protecting them from the mother. Despite all of these efforts, over eighteen months, the father continually refused to take a leadership role, to acknowledge and address the mother's significant problems, or to assure that the children would be protected from the mother. No caseworker, no counselor, no one who had had significant involvement with the case indicated that, with this rec-

---

19. The findings in the jeopardy order dated November 1, 1999, compared with the trial court's finding nearly a year later, October 5, 2000, indicate little change and little progress in the father's situation in the intervening year.

20. Fairly read, the testimony offered to support the parents by members of their church reflected some problems seen, even in the narrow context in which they were familiar with the parents' home life and parenting skills.

ord, they believed that the father was likely to soon change direction and become willing and able to protect Scott and/or Kaleb from jeopardy or that the father's obdurate refusals to recognize and address the mother's problems were likely to change within a time which was reasonably calculated to meet Scott or Kaleb's needs. The trial court's finding of parental unfitness pursuant to section 4055(1)(B)(2)(b)(i) was not effected by its error in referencing best interests—beyond any doubt.

[¶ 44] Because of the court's finding that the father "still insists that [the mother] can parent his child," it is also evident that the court could have found, had it addressed the issue, that the father was "unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs." 22 M.R.S.A. § 4055(1)(B)(2)(b)(ii). This also appears established, without dispute, from the parents' eighteen-month track record prior to the termination order.

[¶ 45] This is not a case where a trial court, or a jury, did not make an essential finding. *Cf. Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *State v. Griffin,* 487 A.2d 247, 249 (Me.1984). Although, even such a failure to find an essential fact may be harmless error. *Neder,* 527 U.S. at 18–20, 119 S.Ct. 1827. Here, the trial court found all the essential facts. It applied the proper standard of proof, and its findings are fully supported by the record. Its only error is its rhetorical reference to the primacy of the best interest issue.

[¶ 46] Last year in *In re William S.,* 2000 ME 34, 745 A.2d 991, we recognized that "[c]hild protection cases are unique. Everyone involved in the case must act in an expeditious manner for the best interest of the child." *Id.* at ¶ 13, 745 A.2d at

996. We also observed that "[a]ny delay potentially harms a child who has already endured significant trauma and is in dire need of permanency." *Id.*[21]

[¶ 47] To remand the case now only delays what the factual history suggests is the inevitable. As the court found last year: "The child Kaleb cannot wait for his father to come around and become realistic.... Time is of the essence." We ignore those findings if we now vacate and remand to the trial court for what will have to be a reopened testimonial hearing, since the facts testified to by every person who had significant involvement with the case point to the result reached by the trial court. The trial court may have erred in stating that the best interest factor "takes precedence" over the parental fitness factors. But the trial court then proceeded to address the parental fitness factors with findings adverse to the parents by clear and convincing evidence.

[¶ 48] In reaching its findings, the trial court followed the order suggested by the statute. There is nothing in the trial court's opinion to suggest that the "best interest" findings led to, or controlled, the unfitness findings. The Court's opinion does not and could not suggest that the evidence is insufficient to support the independent findings of parental unfitness which the trial court reached by clear and convincing evidence. Because those findings are independent and adequately supported by the record, any error which the court made in rhetorically discussing the best interest standard is, without any doubt, harmless. Accordingly, I would affirm the judgment of the trial court.

---

**21.** In *William S.,* a child protective case, we found error, but affirmed applying an "obvi-

ous error" analysis.