STATE OF MAINE
Knox. S.S., Clerks Office
SUPERIOR COURT

AUG 3 1 2001

RECEIVED AND FILED
Susan Guillette, Clerk

STATE OF MAINE

KNOX, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-00-007
JRA-KNO-8/31/2001

GERALD L. RITTERSDORF
PATRICIA L. RITTERSDORF,

      Plaintiffs

    v.

JONATHAN D. WHIFFEN
and DARLENE WHIFFEN,

      Defendants

   and

JOSEPH SUTTON and MAINE
STATE HOUSING AUTHORITY,

      Parties-in-Interest

**DECISION AND ORDER**

## I.    Introduction.

This matter is essentially a dispute over the location of the common boundary between two lots in Rockland which are owned by the plaintiffs, the Rittersdorfs, and the defendants, the Whiffens. The parties-in-interest are mortgagees of the defendants and have taken no active role in this litigation.

The plaintiffs seek to establish the boundary they favor in the traditional way by asking the court for a declaratory judgment establishing the location of the line via count I of their complaint.

In counts II and III they also promote adverse possession theories to support the claim that they are entitled to the property within the boundary line they cite.

In count IV, they assert an alternative theory of law that the boundary they espouse has been established by acquiescence or agreement.

In count V they plead a cause of action in trespass which complains that defendant Jonathan Whiffen entered on their property to place posts marking the line he favors.

In another count labeled V, the plaintiffs assert that the defendants are maintaining a nuisance by operating an auto repair facility on their property in violation of Rockland's zoning ordinance.

For their part, the defendants have answered and filed a counterclaim in five counts. In count I they allege that the plaintiffs are trespassing on their property by their location of a fence on the land the defendants claim. As a result, they seek injunctive relief, namely the removal of the fence.

In count II, they reallege the trespass claim and ask for damages, including punitive damages, because they say the trespass is intentional.

The three remaining counts alleging common law adverse possession, statutory adverse possession, and boundary by acquiescence were abandoned at trial.

A two-day nonjury trial was conducted, the parties have submitted post-hearing proposed findings of fact and conclusions of law, and the case is in order for disposition.

II.    Discussion.

The Rittersdorfs and the Whiffens are next door neighbors who have adjoining lots on Birch Street in Rockland. The Rittersdorfs are at number 7 Birch Street, the Whiffens at 99 Cedar Street -- the latter reflects a Cedar Street address because the Whiffens' property is the corner lot where Cedar meets Birch Street.

The Rittersdorfs purchased their property in 1981 from Ellen Cummings. That year they erected a stockade fence for which they received a permit from the City of Rockland. The fence runs along the westerly side of their lot from a utility pole by the

2

street to a stake at the rear, southwest corner of the lot. These two points, the utility pole and the stake, had been pointed out as the ends of this westerly line to the Rittersdorfs by Ellen Cummings.

The Whiffens bought the lot next to, and westerly of, the Rittersdorfs, from Joseph Sutton in 1992. Thereafter, a previous owner of the lot, John Sanford, told Jonathan Whiffen that the Rittersdorf fence was on his, Whiffen's, property. As a result, Jonathan Whiffen made a variety of efforts to measure his frontage along Birch Street to see if the Rittersdorf fence encroached on his property.

Because his deed told him he had 130 feet along Birch Street, he measured that distance in a variety of ways from the intersection of Cedar and Birch, and found that these measurements put his line easterly of the Rittersdorf fence, convincing him that the fence was on the Whiffen's property. When he got no satisfaction from Gerald Rittersdorf as to his claim that the fence encroached on the Whiffen's lot, he retained a surveyor, Joseph LaBranche. LaBranche confirmed Whiffen's contentions and produced a survey, defendant's exhibit 2, which showed that the Whiffen's lot had 130 feet of frontage on Birch Street, running from a pipe at its intersection with Cedar Street to a point 8.6 feet easterly of and beyond the Rittersdorf fence. LaBranche also found a flat bar deep in the ground a short distance beyond his measurement of 130 feet. From this LaBranche and Whiffen concluded that the Whiffen property ended east of the Rittersdorfs' fence and that their fence intruded into the Whiffen's property by 8.6 feet.[1]

Jonathan Whiffen gave Gerald Rittersdorf a copy of the LaBranche survey but was still unsuccessful in convincing his neighbor as to the merits of his claim. Perhaps

---

[1] The contention between the parties as to the differences in the lines they assert are proper is 9.6 feet rather than 8.6 feet. The one foot difference is due to the Rittersdorfs' contention that they own another foot to the west of their fence.

as a result, Whiffen obtained a permit from the City of Rockland to erect a fence easterly of the Rittersdorf fence. Consistent with the issuance of that permit, he installed at least two posts near the line he claims, and east of the fence, with the result that these structures were on lawn the Rittersdorfs claim and blocking a truck and boat they kept there from access to Birch Street.

In the meantime, the Rittersdorfs retained a surveyor, Nathaniel Beal, who confirmed their version of where the line is sited, and also determined that the Whiffen frontage on Birch Street was 120 feet, not the 130 feet reflected in the Whiffens' deed. Persuaded by Beal's analysis, this court (*Mead, C.J.*), issued a preliminary injunction barring the defendants from entering on the plaintiffs' property which the court found to be bounded on the west as surveyor Beal had asserted. Accordingly, the posts erected by the Whiffens were found to be on the plaintiffs' property and were, presumably, removed by them until this dispute could be finally resolved.

As this exposition suggests, the question presented by the parties' dispute is a simple one -- is the Whiffen's line along Birch Street 130 feet as they claim, or is it 120 feet as the plaintiffs assert? If the latter, then the Rittersdorf fence is properly placed; if the former, then it is not, and the Whiffens' lot is larger than earlier believed. While the question is a simple one, reaching the proper answer is a more complex undertaking.

In this regard the court finds the analysis of surveyor Nathaniel Beal persuasive and his testimony credible as to the proper measurements of these lots.

He found, as does this court, that the legal source for the existence of these lots was the deed of partition of the Estate of Nancy Perry. She owned a parcel of property in Rockland which now encompasses these lots. At her death, circa 1863, the Probate Court appointed commissioners to divide her property up so that it could be

4

distributed to her heirs. The commissioners did as they were asked, and a deed of partition was created dividing this particular tract into eight lots. Each lot was given appropriate measurements, and the court concludes, as did surveyor Beal, that the plan created by O.H. Tripp in July, 1931, plaintiffs' exhibit 6, properly describes these eight lots, and therefore the lots which ultimately became, in part, the lots of the parties.

More specifically, the lot conveyed by this partition to Sophia C. Perry, which ultimately became the source lot of the Whiffens as it relates to Birch Street, shows 118 feet of frontage on that road, and the lot conveyed in trust to Richard P. Furbish, which ultimately became the Rittersdorf lot as it relates to Birch Street, shows 110 feet of frontage on Birch.

In his analysis, Beal started at the Maverick Street end of the Nancy Perry property and worked west, confirming the lines lot by lot by reference to the deed of partition, the Tripp plan, and the land as it appears today. This should have been a straightforward process until he reached the western most lot, bordering Cedar Street, which was set off to Sophia C. Perry, and which ultimately came to be owned, in part, by the Whiffens.

Sophia C. Perry was also the guardian of Richard P. Furbish,[2] a grandson of Nancy Perry. The deed of partition provided for him by allocating to Sophia C. Perry, in trust for him, the seventh of these eight lots. This lot, which is shown on the Tripp plan as the Richard P. Perry lot, was described as beginning on what is now Frederick Street at the southwesterly corner of the lot set off to Emma S.C. Pease, the sixth lot in order from Maverick Street. Unfortunately, the lot allocated to Sophia C. Perry alone,

---

[2] There is no dispute that Richard Furbish later became known as Richard Perry and later conveyed this lot using the latter name. Plaintiffs' exhibit 2.

5

the eighth and most westerly lot, is also described as beginning at the same point, namely the southwestern corner of the Emma S.C. Pease lot, and sharing a common boundary on the west with the Pease lot.

Obviously, these overlapping descriptions create an inconsistency, but one that can be resolved by a further examination of the lot set off solely to Sophia C. Perry. This lot is described as bordered on the west by Cedar Street for 180 feet. It is also described as bordered on the south by a reserve, to become Frederick Street, for 115 feet, while the lot for Richard Furbish makes no mention of Cedar Street and borders the reserve for 110 feet. From this, it appears plain that these are two different lots that do not overlap despite the common references to the Emma Pease lot. Indeed, if one were to place the dimensions of the Sophia Perry lot in proper reference to the remaining lots and Cedar Street, and honoring the dimensions described in the deed of partition, one would be left with a lot between it and Emma Pease's lot which matches that which was conveyed in trust for Richard Furbish. Thus, it can be concluded that the reference in the deed to Sophia C. Perry to the Emma S.C. Pease lot was simply a scrivener's error, perhaps caused by the circumstance that two lots were conveyed to Sophia C. Perry, albeit one in trust for Richard P. Furbish.

As noted, the lot allocated in trust for Richard Furbish, when thus ascertained, contains the measurements as reflected in the deed of partition and on the Tripp plan with 110 feet on Birch Street.

The lot set off to Sophia Perry, with the correction of the references to the lot of Emma S.C. Pease, should therefore have been described in this way:

> Beginning on the northerly side of a reserve forty feet wide for a street [Frederick Street] at the southwesterly corner of land set off to Sophia C. Perry in trust for Richard P. Furbish, thence south 56 1/4 W by said

6

reserve one hundred and fifteen feet to a stake and stones on Cedar Street thence N. 33 3/4° W by said Cedar Street about one hundred and eighty feet to a reserve forty feet wide for a street [Birch Street] thence N. 56 1/4° East by said reserve about one hundred and eighteen feet to land of <u>said Sophia C. Perry in trust for Richard P. Furbish</u> thence by said land about one hundred and eighty feet to place of beginning . . .

Such a description honors and includes all the dimensions and references in the deed of partition but simply substitutes the lot for Richard Furbish for that of Emma S.C. Pease. This interpretation of the deed also obeys the standard rules of construction which dictate that "boundaries are controlled, in descending order of priority, by monuments, courses, distances, and quantity . . ." when there is an ambiguity. *Lawton v. Richmond*, 1997 ME 34, ¶ 9, 690 A.2d 953, 955. Were the interpretation of these deeds to be otherwise, no lot would have been set off for Richard Furbish and the lot solely for Sophia C. Perry would have 225 feet of frontage on Frederick Street and 228 feet on Birch Street -- a configuration which is inconsistent with the entirety of the deed of partition, the portion of the deed which sets off a lot solely to Sophia Perry, as well as the apparent intent of the grantor to provide for specific heirs. Finally, as noted, this revised description leaves intact the description of the lot which ultimately became Richard Perry's.

Thus, with this correction, there are two defined lots which become the sources for the description of the lots of the parties in this action.

With respect to the Richard P. Perry lot, it was conveyed in 1874 to Charles A. Keen, Jr., using a description nearly identical to that which conveyed this lot to the grantor's trustee in 1863 and referencing the grant under the Nancy Perry estate. This deed to Keen, as had the deed of partition, describes a boundary along "a reserve," to become Birch Street, of "about one hundred and ten feet." Plaintiffs' exhibit 2. Keen

divided this lot in half in 1885, conveying the northerly part to Clarence M. Blake in 1887, and describing this lot as 90 by 110 feet, with the latter dimension running along the reserve which was to become Birch Street, with the same dimension along a parallel line forming the northerly border of the new lot to the south, and 90 feet along the Emma S.C. Pease lot with a corresponding parallel 90 foot line to the west. It is this northern lot which ultimately became the Rittersdorfs' and serves to support their claim via an unbroken chain of titles to 110 feet of frontage on Birch Street. *See* Plaintiffs' exhibit 4.

Sophia Perry divided her lot into three. She first sold a lot at the southwest corner of her parcel at the intersection of Cedar and Frederick Streets to Laura J. Rhoades in 1877. It was described as having 90 feet on Cedar Street and 65 feet on the reserve, which was to become Frederick Street, with respective parallel lines of the same dimensions, thereby forming a rectangle of 90 by 65 feet. In 1880, she conveyed the next lot to the east of this new lot, also to Laura J. Rhoades.[3] This deed described a line running along Frederick Street from the first Rhoades lot 65 feet "more or less" to the land of C.A. Keene (sic). This lot, too, was ninety feet deep with the result that Laura J. Rhoades had two identical adjoining lots with a combined frontage on Frederick Street of 130 feet, rather than 115 feet of frontage as Sophia Perry received in the deed of partition.

In 1883, Sophia Perry conveyed her remaining land to Johnson Staples, describing it with 130 feet running from Cedar Street to the land of C.A. Keene (sic), thence "90 feet to contemplated street" [Birch Street] . . . "thence . . . by said

---

[3] The scrivener of this 1880 deed spells "Rhoades" as "Rhoads" twice, but it appears that this is probably the same person who was the grantee of the 1877 deed.

contemplated street 130 feet, more or less, to Cedar Street . . ." In this fashion, Staples received a lot of 90 by 130 feet, with 130 feet on Birch Street, with 90 feet of depth to the parcels conveyed to Laura J. Rhoades, and a common parallel boundary with the two Rhoades' lots of 130 feet. After many conveyances in the interim, the defendants took title to the lot conveyed by Sophia C. Perry to Johnson Staples, and it is the latter's deed they rely on as the basis for their claim to 130 feet of frontage on Birch Street[4] which extends on to the Rittersdorf property.

Despite the text of these deeds which use the measurement of 130 feet, more or less, the court concurs with the opinion of surveyor Nathaniel Beal that Sophia C. Perry could not have conveyed lots with that distance as she never received lots with that dimension. Instead, her conveyances to Laura J. Rhoades should have totaled 115 feet along Frederick Street, and her conveyance to Johnson Staples should have reflected 118 feet along what was to become Birch Street because those were the parallel dimensions of the lot she received via the deed of partition. It is axiomatic that one cannot convey title to what one does not own.

Instead, the defendants' line along Birch Street is as measured by surveyor Beal and is 120.33 feet, the difference between this measurement and the 118 feet along that street as originally conveyed to Sophia Perry accounted for by the laying out of Cedar Street which was not placed as originally planned and referenced in the deed of partition.

---

[4] Apparently all the interim deeds use the measurement of 130 feet.

The boundary of the Whiffen lot along Birch Street is not 130 feet as originally reflected in Sophia Perry's deed to Johnson Staples not only because she did not have 130 feet to convey, but, most likely, because a scrivener erred and wrote "130" instead of "120" for the distance from Cedar Street as to the land of C.A. Keen. Such an error is not surprising given the ease for which 130 might replace 120, but also given the other scrivener's errors in Sophia Perry's grants. These can be found in the second deed to Laura Rhoades in which her name is twice misspelled and she is conveyed a second lot of "more or less" sixty-five feet in width, either because it was not measured or simply as a short cut to convey to her a second deed that was the same as the first as to dimensions.

Additionally, where the dimensions of the plaintiffs' lot along what was to become Birch Street has remained consistently at 110 feet from the deed of partition until the plaintiffs took title, it would be inconsistent with that unbroken history to have that dimension yield to the measurement promoted by the defendants which cannot be found in the deed of partition nor anywhere else until Sophia Perry makes her conveyance to Johnson Staples 20 years later.

Next, in the description of the lot which Sophia Perry conveyed to Johnson Staples, the 130 feet along Birch Street begins at the lot of C.A. Keene (sic) and runs southwesterly to Cedar Street. That being so, if there is a shortage, it occurs at the terminus of the line at Cedar Street, not where it begins at the Keen line which is firmly established as beginning at a stake and stones and running a specific course to Birch Street. *See* plaintiffs' exhibit 1, page 120. Because the standard rules of construction require that boundaries are controlled in the descending order of priority by monuments, courses, distances and quantity, *Lawton v. Richmond*, 1997 ME 34, ¶ 9, 690

A.2d 953, 955, and because the line separating the Richard Furbish (Keen) lot from Sophia Perry's is established by a monument and a course with a terminus on Birch Street, the perpendicular line in contest, which is not so supported except by reference to the Keen line, must yield as to its dimensions.

This conclusion of law is further supported by the Law Court's exposition in the rules of construction which holds that, "When a deed describes the land conveyed by reference to an adjoining deed, the boundary line of the adjoining tract referred to becomes a monument to which courses, distances and quantity must yield." *Snyder v. Haagen*, 679 A.2d 510, 514 (Me. 1996). Thus, because the deed from Sophia Perry to Johnson Staples refers to the adjoining land of C.A. Keene (sic) which is established by a deed from Richard Perry and the deed of partition, that reference to the boundary separating the Sophia Perry property from Keen's may be considered a monument to which the 130 foot distance line referenced in the deed to Staples must yield as to its distance because it is not supported by a monument other than that perpendicular line to Birch Street which has its origin at a monument and is described by a course and distance.

The defendants endeavor to support their claim to a 130 foot line running from Cedar Street northerly along Birch Street by the discovery by their surveyor of a flat bar, one and a half feet in the ground, that was a few feet beyond the 130 foot measurement running from a pipe he found at the intersection of Birch and Cedar. The deed of partition, however, makes no mention of such markers or monuments and their origin is simply unknown. As such, neither can be considered a monument and cannot be considered in this debate by virtue of Maine case law which so holds. *Milligan v. Milligan*, 624 A.2d 474, 478 (Me. 1993).

11

From all of this, the court finds by a preponderance that the dimensions affecting the parties' respective rights are as established in the standard boundary survey, dated June 5, 2000, as prepared by Frederick E. Beal and Nathaniel G. Beal, so that judgment will be entered for the plaintiff on count I of the complaint.

The plaintiffs also claim the 9.6 feet in dispute by adverse possession as that legal theorem is established by statute or in the common law. Title by adverse possession may be established in either fashion. *Striefel v. Charles-Keyt-Leaman Partnership*, 1999 ME 111, ¶ 5, 733 A.2d 984, 989. Each of these approaches, however, requires that the possession of the premises be "under a claim of right." *Striefel, id.*, ¶ 14; 14 M.R.S.A. § 810-A. "Under a claim of right" means that the claimants, the Rittersdorfs, must be "in possession as owner, with intent to claim the land as [their] own, and not in recognition of or subordination to [the] record title owner." *Striefel, id.* Said differently, the Rittersdorfs must prove that their possession of the land along this disputed boundary was with the intent to claim title to it in opposition to the owner of record. *Id.*

The evidence adduced would not support such a finding. Indeed, as the court has found herein, the plaintiffs have had good title to this disputed strip and reasonably held this belief from the date they took title until confronted by Jonathan Whiffen sometime in 1992. In the interim, they had built their fence and enjoyed this property as their own without any thought or consideration to the possibility that there may be another record title owner or to the desirability of using this property in a fashion that would ultimately allow them to claim title. That being so, they cannot establish that they possessed this strip of land "under a claim of right." Absent success in establishing this essential element under either theory of adverse possession, they cannot prevail

12

under either approach to establishing adverse possession and judgment is to be entered for the defendants on counts II and III of the complaint.

By virtue of the same evidence and reasoning, the plaintiffs also cannot establish the common law element that their possession of this land was "hostile." " 'Hostile' simply means that the possessor does not have the true owner's permission to be on the land." *Striefel, id.,* ¶ 13 (quoting *Falvo v. Pejepscot Indus. Park,* 1997 ME 66, ¶ 9 691 A.2d 1240, 1243). Because the Rittersdorfs are the true owners of the disputed land, they, of course, had no one to deny permission to them as to the land's possession. Their possession was therefore not "hostile" as our law defines that term.

Though the court finds that the failure of proof as to these elements dooms the plaintiffs' adverse possession counts, the court can and does find that the remaining elements have been established by a preponderance of the evidence.[5] Thus, the court finds that the plaintiffs have established that they actually possessed the land in question in an open, visible and notorious fashion, continuously and exclusively for more than 20 years.

In this regard, the court finds that the Rittersdorfs constructed a fence, which still stands today, on or about September 30, 1981, having purchased their land from Ellen Cummings the previous month. *See* plaintiffs' exhibits 7, 11. From that time forward until the Whiffens placed their posts in 2000, the Rittersdorfs possessed the land to the east of the fence in an actual, open, notorious, and continuous way.

Prior to the Rittersdorfs' purchase of this lot, their predecessors, the Cummings, exercised similar dominion and control over this same area for a period of time, which,

---

[5] Such findings are made now to avoid having to do so on remand if, after appeal, the Law Court disagrees with this court's analysis as to these counts of the plaintiffs' complaint.

13

when "tacked" on to the Rittersdorfs' possession, greatly exceeds the required 20 years. *Gutcheon v. Becton*, 585 A.2d 818, 822 (Me. 1991). This conclusion is supported by the testimony of Janette Small, the Cummings' daughter, and the granddaughter of the Fernalds who owned this property before the Cummings. She lived there from 1940 to 1958 and was familiar with the property thereafter because her parents lived there. She testified that the Rittersdorf fence runs along the property's boundary, but that her parents owned about a foot beyond that -- an understanding consistent with the Rittersdorfs' and surveyor Beal's findings. Over the years, the Cummings used this property, mowed the lawn, and planted a garden right up to a slight down grade in the terrain beyond which was the neighbors' property. According to her, then, the Rittersdorf fence is within this area which her family controlled for many years. As such, the court can find that there has been continuous and exclusive possession of this disputed land by the Rittersdorfs and their predecessors in title for more than 20 years.

With respect to count IV, in which the plaintiffs assert that the boundary has been established by acquiescence, the proof also fails to establish any right the plaintiffs may have to the land in question under this theory of law.[6]

The elements of boundary by acquiescence are described in *Dowley v. Morency*, 1999 ME 137, ¶ 16; 737 A.2d 1061, 1067. The third of these elements, which must be established by clear and convincing evidence, is "conduct by the adjoining landowner from which recognition and acquiescence not induced by fraud or mistake may be fairly inferred." *Id.* The testimony presented at trial simply cannot support a finding in the plaintiffs' favor as to this element. Soon after they purchased their lot, the Whiffens

---

[6] Perhaps recognizing the shortcomings of this claim, it is not mentioned in the plaintiffs' trial brief or in their proposed findings of fact and conclusions of law.

14

challenged the location of the Rittersdorf fence and persisted with the claim that their land ended beyond this fence. Apparently, they were inspired in this regard by a predecessor in title who also believed that the fence went beyond the proper bounds of its lot. Unfortunately for this claim, the court has no evidence as to the interaction between these predecessors and the Cummings so it can be determined clearly and convincingly that they acquiesced in the Cummings use of this land. Thus, at best, the plaintiffs have evidence that from the time of the construction of their fence in 1981 until the Whiffens challenged their mutual line in 1992, no one challenged their boundary. If this was acquiescence, it was not for a sufficiently lengthy period so, ". . . that the policy behind the doctrine of acquiescence is well served by recognizing the boundary." *Id.* All this being so, the plaintiffs' evidence fails to meet their burden of proof to establish boundary by acquiescence and judgment must be entered for the defendants on count IV of the complaint.

In count V, the plaintiffs complain of Jonathan Whiffen's alleged trespass on to their land on April 4, 2000, where he placed his own fence posts. According to *Royal Insurance Co. v. Pinette*, 2000 ME 155, ¶ 6, 756 A.2d 520, 523, ". . . all that is required for liability in trespass is the intent to be on the land, even if the trespasser had no knowledge that he was on the land of another and had no intention of harming the owner of that land. Liability for trespass exists despite the defendant's mistake, inadvertence or negligence."

Applying this statement of Maine law to the facts in this case, the court finds that the plaintiff has established by a preponderance that the defendant, Jonathan Whiffen did trespass on the Rittersdorfs' property on or about April 4, 2000. He did so by entering on the Rittersdorfs' land, east of their fence and driving two posts into their

15

land, ostensibly for the purpose of constructing his own fence pursuant to a permit issued by the city.

The court makes this finding because it has found herein that the land where Mr. Whiffen drove these posts was not his but, rather, the Rittersdorfs. According to the teaching of *Royal Insurance Co. v. Pinette, id.,* it is of no consequence that Mr. Whiffen had good cause to believe the land was his by virtue of the survey prepared by Joseph Labranche and that he also had a permit from the city to install a fence at or near where he put the posts into the ground. The gravamen of a civil trespass is the intent to be on this land, which is here fully established, even if the trespasser did so, as is the case here, without knowledge that it was another's and with no intent to harm the owner.

Because the court concludes that although Jonathan Whiffen trespassed on the Rittersdorf land on or about April 4, 2000, it will award nominal damages only, namely Ten Dollars. It does so because this defendant acted under the reasonable belief that the land was his and the plaintiffs suffered only trivial damages by the former's actions.

The plaintiffs have also presented a nuisance count against the defendants, misnumbered as count V. In it, they simply allege that the defendants are operating an auto repair facility on their property which violates Rockland's zoning ordinances. As such, the plaintiffs appear to claim that this violation is a nuisance per se.

In addressing this contention, the court finds that the defendant, Jonathan Whiffen, has, on occasion, performed minor automotive repairs on vehicles belonging to other family members who did not reside at his home. The court also finds that all the vehicles shown in the admitted photographs belong to the defendants, except a VW bus which was left there by a friend for approximately a month. From this the court cannot find that the defendants conduct an automotive repair enterprise on their

16

property as a home occupation as defined in Rockland's zoning ordinance. While the collection of cars on their land may be unsightly to some, the defendants violate no ordinance cited to the court by owning a number of vehicles. Further, repair of their own autos and occasional assistance to relatives by making minor repairs falls short of what the cited ordinance contemplates. All this being so, by virtue of this failure of evidence, the plaintiffs cannot prevail on this count and judgment will be entered for the defendants thereon.

As noted earlier, the defendants have pursued two counts in their counterclaim both of which allege a trespass by the plaintiffs by virtue of the location of their fence on the former's property. Because the court has found, infra, that the Rittersdorfs' fence is properly within their side of the common boundary with the Whiffens, the defendants can prevail on neither count and judgment must be entered for the plaintiffs thereon.

## III. Conclusion.

Based on the foregoing, the clerk will make the following entries:

Judgment is entered for the plaintiffs on count I of the complaint. The court finds and declares that the common boundary separating the lot owned by the plaintiffs from that owned by the defendants on Birch Street in Rockland, Maine, is located as follows:

BEGINNING in the southerly line of Birch Street at a 5/8 inch iron rod with plastic cap marked "Beal 0148/Beal 2286," (which iron rod is located North 58 deg. 39 min. 29 sec. East and 120.33 feet from 3/4 inch iron pipe at the intersection of Cedar and Birch Streets. The iron rod at the point of Beginning is located South 58 deg. 39 min. 29 sec. West and 110 feet from a railroad spike in a 1 inch iron pipe marking the northeast corner of Rittersdorf); then South 30 deg. 48 min. 43 sec. East 90.2 feet to a point.

Judgment is entered for the defendants on counts II, III, and IV of the complaint.

17

Judgment is entered for the plaintiffs on count V (Common Law Trespass) of the complaint. Damages are awarded to the plaintiffs in the sum of Ten Dollars. The defendants are permanently enjoined from entering upon the plaintiffs' real property as herein described.

Judgment is entered for the defendants on count V (sic) (Nuisance) of the complaint.

Judgment is entered for the plaintiffs on counts I and II of the counterclaim.

Counts III, IV and V of the counterclaim are DISMISSED.

The clerk may incorporate this order in the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: August 30, 2001

John R. Atwood
Justice, Superior Court

18