2002 ME 126

**In re Alana S.**

Supreme Judicial Court of Maine.

Argued: June 11, 2002.
Decided: Aug. 2, 2002.

Betsy Crane, (orally), Milbridge, Norman Toffolon, Machias, for the appellants.

G. Steven Rowe, AG, Matthew Pollack, AAG, Michael C. Kearney, AAG (orally), Augusta, for the appellee.

James Crotteau, Lamoine, Guardian Ad Litem.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] The parents of Alana S. appeal from a judgment of the District Court (Machias, *Romei, J.*) terminating their parental rights pursuant to 22 M.R.S.A. § 4055(1)(B)(2) (1992). The parents assert that the evidence of their parental unfitness is insufficient to support termination of parental rights by the requisite clear and convincing evidence standard. They also assert that the court erred in admitting the testimony of a social worker addressing bonding and separation issues regarding their child. Because the District Court's findings were consistent with legislative policies promoting termination of parental rights and adoption in the circumstances of this case, we affirm.

## I. CASE HISTORY

[¶ 2] Alana S. was born on July 7, 1999. She resided with her parents until January 20, 2000, when the Department of Human Services took Alana into its custody based on a temporary order of protection. The temporary order was obtained based on information regarding domestic disputes in the home, although the exact nature of the disputes and the extent to which they did, or did not, involve physical violence remains unclear.

[¶ 3] Alana was returned to her parents on January 26, 2000. Domestic disputes and immature parenting decisions continued to afflict the family, leading to a jeopardy hearing, 22 M.R.S.A. § 4035(1) (Supp. 2001), on March 29, 2000. After this hearing, the court found circumstances of jeopardy to the child's health and welfare, 22 M.R.S.A. § 4002(6) (1992). The court again placed Alana in the custody of the Department, although Alana remained with her mother and, pursuant to the court's order, both entered a placement at St. Andre's Home in Bangor. Separately, the court ordered the mother and father to attend individual counseling and the father to attend domestic violence counseling. Mother and daughter remained at St. Andre's until late June 2000 when the mother left, abandoning Alana. The mother returned to St. Andre's in early July, remaining in the program approximately three weeks before again abandoning Alana to be with the father. On July 28, 2000, Alana was placed with her current foster parents who have become pre-adoptive parents.

[¶ 4] For her first three months in the foster home, Alana, who was barely a year old at the time of the placement, demonstrated significant attachment problems, having to be held and comforted regularly by her foster mother. The record indicates that Alana has made significant improvements in her ability to relate to both her natural parents and her foster parents since that time. The natural parents' contact, however, has been limited to brief weekly visits.

[¶ 5] The record reflects that after the mother left St. Andre's Home, the mother and father resumed living together. They actively and with some success engaged in the counseling offered by the Department to improve their parenting skills, their ability to relate to each other, and their prospects for reunification with Alana. The couple now has another child. In its termination order, the District Court found "no evidence" suggesting jeopardy to this child in the current parenting arrangement. Virtually all the evidence indicated that both mother and father have made progress, using the counseling and support programs offered by the Department to improve their relationship and their parenting skills. However, the evidence also indicated that, at the time of

the hearing, the parents were not yet in a position to reunite with Alana and would need much more counseling and rehabilitation support before reunification could be a serious possibility.

[¶ 6] The Department filed a petition for termination of parental rights in March 2001. A hearing was held on the petition in July 2001. At the hearing, the witnesses generally recognized the progress that the parents had made in their parenting skills and in their relationship, as a result of the counseling and support services offered by the Department. However, several witnesses indicated that the parents still had issues that, perhaps, would prevent full reunification with Alana. Even the mother's counselor indicated that the mother's capacity to parent two children was uncertain. Over the parents' objection, one witness testified that, because Alana had significantly bonded with her foster parents during the year she had lived with them, she would likely be subject to significant emotional trauma if she was returned to a living arrangement with her parents, rather than remaining with, and being adopted by, her foster parents.

[¶ 7] The State and guardian ad litem argued in support of termination primarily because (1) full reunification was not possible in the near future; (2) Alana may be emotionally disrupted by continuing efforts to reunify her with her natural parents; and (3) she has benefitted from bonding with her foster parents. These positions were taken despite the State's and the guardian's recognition of the significant progress that the natural parents had made. Thus, the State argued to the court as follows:

Alana is in a secure attachment with her foster parents. She's been there for close to a year. To remove this child and place her in the home of parents who have completed a counseling program, who have demonstrated whole-hearted cooperation with a reunification plan over time, who have realistic expectations of what they're accounting for—what they're in—should be expecting, that might make some sense. As [a clinical social worker] said, it might be possible, were this child several years older. But we have Alana, at the critical stage of two years. . . . We have this expert saying, in her testimony to you, in a sense, she couldn't even fabricate a—or construct a program to return Alana to the care of her birth parents . . . I gather she couldn't even envision a way to do that, that would not be emotionally disastrous for the child. So that's essentially the jeopardy and the best interests.

[¶ 8] The guardian ad litem's report, after recognizing that the parents' therapists supported continuing efforts towards rehabilitation, despite a contrary position taken by an independent evaluator, stated:

If I viewed the progress of the parents as the primary issue in this matter, I would not hesitate to do the same because I believe [the parents] are trying to make changes and are making progress. However, since I view this case as being mostly about Alana's attachment issues, I find [the independent evaluator's] suggestion that [the parents] have attachment issues of their own very troubling.

Later the guardian stated: "From my perspective, the major issue in the case is the extent to which Alana will suffer attachment difficulties if removed from the foster family at this time."

[¶ 9] The guardian ad litem concluded as follows:

Even though [the parents] have made great strides in their therapy, I do not believe they could meet Alana's needs at this time. If she were returned to their care in the near future, she would be

both extremely needy and extremely demanding. The stress of dealing with her demands as well as those of the new baby could cause [the natural parents] to fall back into their old dysfunctional patterns of behavior. Finally, I am mindful of [the independent evaluator's] finding that both [natural parents] have unresolved attachment issues of their own. Such issues would make it more difficult for [the natural parents] to help Alana address her attachment problems. In my best judgment, Alana needs to remain in the foster home at this time. It is only there that she can feel safe enough to develop a healthy attachment to her caregivers and to continue to grow and develop normally. For those reasons, I recommend that the petition for termination be granted so that Alana can be adopted by her foster family.

[¶ 10] In its order terminating parental rights, the District Court stated that the guardian ad litem's report "is consistent with this order." Applying the clear and convincing evidence standard, the court then made brief conclusory findings regarding the elements necessary to support termination of parental rights pursuant to 22 M.R.S.A. § 4055(1)(B)(2). As applied in this case, § 4055(1)(B)(2) provides that termination of parental rights may be ordered when the court finds by clear and convincing evidence that:

(a) Termination is in the best interest of the child; and

(b) Either:

(i) The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs;

(ii) The parent has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs; [or]

. . .

(iv) The parent has failed to make a good faith effort to rehabilitate and reunify with the child pursuant to section 4041.

The court's findings closely followed this language. The court then made specific findings detailing the history of the case and stating its disappointment with the natural parents' failure to take advantage of the opportunities provided to them to remain with Alana prior to July 2000.

[¶ 11] The court addressed Alana's present living situation, noting that she had "become bonded to her foster parents" and that "if Alana was removed from her foster home, she would be at tremendous risk of psychological harm." The court noted, however, that the testimony from the parents' therapists indicated that "these parents are making present progress in their relationship, and there is no evidence to suggest jeopardy to [the other child] in the current state of affairs." The court stated that the mother had expressed some concerns about her ability to parent two children but that the father was more optimistic in that regard. The court also found that the natural parents "need further counseling to maintain stability in their relationship." The court concluded its special findings by again referencing Alana's "bond" with her foster parents and her "continuing emotional need for the stable home environment they provide" and noting again the natural parents' failures in early 2000 that led to the foster placement. Accordingly, the court concluded that: "The foster parents are seeking to adopt Alana. Alana should remain in the custody of the Department until adoption occurs."

[¶ 12] Based on this analysis, which the court stated was similar to the guardian ad litem's position, the court terminated parental rights. The natural parents then brought this appeal.

## II. DISCUSSION

[¶ 13] From a review of the record, it is evident that the court agreed with the State and the guardian ad litem, concluding that, despite the natural parents' significant progress, jeopardy and parental unfitness were established based (1) in part, on the fact that the natural parents were not yet ready to resume parenting and their future prospects of resuming parental capacity were uncertain, and (2) in part, on the perceived bonding of Alana with her foster parents and the anticipated emotional disruption that would be inherent in returning Alana to her natural parents, no matter how competent their parenting skills.

[¶ 14] The "bonding" factor and the fully predictable emotional disruption that any child is likely to encounter when any long-term parenting arrangement changes are appropriate for consideration in the court's "best interest" analysis. 22 M.R.S.A. § 4055(1)(B)(2)(a). However, the fact that a very young child may have bonded with the child's foster parents, because the child has lived with those parents for a significant portion of the child's life, cannot control an evaluation of the parenting capacity or parental fitness of the natural parents pursuant to 22 M.R.S.A. § 4055(1)(B)(2)(b).

[¶ 15] In *In re Scott S.*, 2001 ME 114, ¶¶ 19–21, 775 A.2d 1144, 1150–51, we emphasized the significant body of precedent regarding termination matters that provides that a court must first determine that the State has proven parental unfitness by clear and convincing evidence. We held that "'notwithstanding the sequence in the statute, the trial court must find, by clear and convincing evidence, one of the four bases of parental fitness ... before it may consider the best interests of the child.'" *Id.* ¶ 19, 775 A.2d at 1150–51 (quoting *In re Melanie S.*, 1998 ME 132, ¶ 5, 712 A.2d 1036, 1037). Therefore, we stated that, "although the best interest factor alone may prevent the termination of parental rights, it will never, standing alone, be a basis for a termination." *Id.* ¶ 21, 775 A.2d at 1151.

[¶ 16] In *Scott S.*, we vacated because, while the court made all of the necessary parental unfitness findings, the court indicated that its best interest determination took precedence over parental unfitness. *Id.* ¶ 1, 775 A.2d at 1146. Our reasoning in *Scott S.* was grounded in the constitutional rights of parents that are inherent in the parent-child relationship, as articulated by the United States Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). *Id.* ¶ 20 n. 12, 775 A.2d at 1151. In *Troxel*, the Court stated that "[t]he liberty interest ... of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65, 120 S.Ct. 2054.

[¶ 17] In *Rideout v. Riendeau*, 2000 ME 198, ¶ 12, 761 A.2d 291, 297, we stated that, through the application of these fundamental rights, "the best interests of the child standard, standing alone, is an insufficient standard for determining when the State may intervene in the decision making of competent parents." The reason for the constitutionally required separation of parental fitness issues from best interest issues, which includes bonding, is apparent on even cursory examination. If bonding analysis is the sole determiner in a parental fitness analysis, then any time a child, particularly a very young child, is placed into foster care for a period of time, bonding may occur. Given improper weight, bonding may be used to justify permanent alienation of a child from the child's natural parents, no matter how competent the natural parents may be.

[¶ 18] The purposes stated for the Child and Family Services and Child Protection Act include direction to the Department and the courts to "[g]ive family rehabilitation and reunification priority as a means for protecting the welfare of children, but prevent needless delay for permanent plans for children when rehabilitation and reunification is not possible." 22 M.R.S.A. § 4003(3) (Supp.2001). Accordingly, the law in effect at the time directed the Department to support parents through counseling and other services to improve their parenting skills. 22 M.R.S.A. § 4041(1)(A) (Supp.2001);[1] *see also In re Annie A.,* 2001 ME 105, ¶ 21, 774 A.2d 378, 384.

[¶ 19] The family rehabilitation purposes of the law would provide false hope for natural parents who successfully commit themselves, with Department guidance, to acquiring new parenting skills, only to be told that their efforts and successes are for nothing, because their child, once bonded with a foster family, will not be returned to them. The Legislature cannot have intended such a result.

[¶ 20] While the trial court may have been mistaken in emphasizing the bonding factor in making its findings regarding parental unfitness, it is evident that other factors, independent of bonding, supported the parental unfitness determinations. The court found three of the four parental unfitness criteria stated in 22 M.R.S.A. § 4055(1)(B)(2)(b) proven by clear and convincing evidence. If the record supports any one of the three alternatives found by the court, then the court's findings are sufficient to support termination.

[¶ 21] The purpose statement of the termination of parental rights law, 22 M.R.S.A. § 4050 (1992), includes the Legislature's statement of intent to "[e]liminate the need for children to wait unreasonable periods of time for their parents to correct the conditions which prevent their return to the family," *id.* § 4050(2), and to "[p]romote the adoption of children into stable families rather than allowing children to remain in the impermanency of foster care," *id.* § 4050(3).

[¶ 22] Here, the record before the District Court established, without significant dispute, that (1) as of the date of the hearing, Alana had been in the Department's custody for approximately 18 months; (2) she had been living with her pre-adoptive parents for approximately one year; (3) the child had a need for stability and permanency in relationships; and (4) the natural parents were not in a position to soon secure full-time parenting and their future prospects to do so were uncertain.

[¶ 23] Thus, the court's finding that the parents were "unwilling or unable to take responsibility for [Alana] within a time which is reasonably calculated to meet the child's needs," *id.* § 4055(1)(B)(2)(b)(ii), is established, really without much doubt, particularly when the legislative policies governing termination are considered.

[¶ 24] Because this alternative finding of parental unfitness is supported by evidence that is at least clear and convincing, the court's termination judgment must be affirmed.

[¶ 25] As a separate issue on appeal, the natural parents challenge the court's admission of the testimony of a social worker regarding the impact of bonding and the potential emotional disruption that the child might face if she was returned to her natural parents. If there was any error in the admission of this testimony it was harmless because the

---

1. 22 M.R.S.A. § 4041(1) has been repealed and replaced by P.L.2001, ch. 559, §§ CC–4, CC–5 (enacting 22 M.R.S.A. § 4041(1–A) (effective March 25, 2002) clarifying rehabilitation and reunification responsibilities and services.)

court's judgment is supported by findings unrelated to the bonding issue.

The entry is:

Judgment affirmed.