**TELERENT LEASING CORP., Plaintiff**

v.

**PINE STATE PLUMBING & HEATING, INC. and Samuel Marcisso, Jr. Defendants**

**No. CIV. 02–170–P–C.**

United States District Court, D. Maine.

Nov. 11, 2002.

Steven E. Cope, Esq., Cope & Cope, Portland, for Telerent Leasing Cor, plaintiff.

Christopher C. Taintor, Esq., Paul F. Driscoll, Esq., Norman, Hanson & Detroy, Portland, for Pine State Plumbing and Heating, Inc., Samuel Jr Marcisso, defendants.

**MEMORANDUM OF DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR ATTACHMENT AND ATTACHMENT ON TRUSTEE PROCESS**

GENE CARTER, District Judge.

In this action Plaintiff seeks to recover from Defendants for the cost of heat and air conditioning equipment sold by Defendants to Plaintiff for purposes of its leasing business. Plaintiff is alleging, *inter alia,* fraudulent and negligent misrepresentation and breach of contract. Plaintiff has moved for approval of attachment and attachment on trustee process in the amount of $650,000 against the property of Defendants. Motion for Attachment and Attachment on Trustee Process and Incorporated Memorandum of Law (Pleading No. 3) [hereinafter Motion for Attachment].

## I.  FACTS

On the record made for purposes of the pending motion the Court concludes that

the facts pertinent to its resolution are the following:[1] Plaintiff Vendor Capital Group ("VCG"), a division of Telerent Leasing Corp., provides lease and other financing to hotels and other businesses for the acquisition of machinery, equipment, furniture, fixtures and other goods used in the hotel operation. In December of 1997, a partnership known as the Madden Group of Maine (the "Maddens"), applied to VCG for an equipment lease for certain heat and air conditioning equipment ("HVAC") to be installed at the Eastland Hotel (the "Eastland") in Portland, Maine, which was owned by the Maddens at that time. Consistent with its usual practice, VCG advised the Maddens that any lease entered into with the Maddens would provide funds only for the cost of the HVAC equipment itself, and not for the expenses of the installation of the equipment or to purchase any other items necessary for the installation.

Soon after VCG so advised the Maddens, the Maddens retained Defendant Pine State Plumbing & Heating, Inc. ("Pine State") to design and install an HVAC system in the Eastland. Defendants Pine State and Samuel Marcisso, Jr. ("Marcisso"), the president, sole shareholder and chief executive officer of Pine State, were informed by the Maddens that the Maddens were seeking financing from VCG for the HVAC system. Defendants further knew that the Maddens sought and intended to obtain this financing for the entire HVAC contract, inclusive of the cost of installation. See Deposition of Samuel Marcisso, attached to Motion for Attachment, at 33.

Defendant Pine State subsequently provided a breakdown of the equipment prices, indicating a total equipment cost of $604,483. At the time this breakdown was prepared and submitted, Defendant Marcisso had actual knowledge that the costs set forth did not represent the actual cost of the equipment only, but that in fact, the actual cost of the equipment by itself was approximately $211,000. The $604,483 represented the total cost of all equipment, parts and expenses of installation. Nevertheless, on January 22, 1998, Pine State and the Maddens executed a contract for the HVAC project for the aforementioned amount. VCG, as lessor, then entered into an equipment lease with the Maddens, as lessees. Paragraph 11 of the Master Lease entered into between Plaintiff VCG and the Maddens stated that "INSTALLATION SHALL BE LESSEE'S SOLE RESPONSIBILITY AND AT LESSEE'S SOLE EXPENSE."

In accordance with its obligations under the Master Lease, VCG submitted a written purchase order to Pine State for the purchase and installation of the HVAC at the Eastland. Between April 1998 and May 1999, Pine State acquired and installed HVAC equipment in the Eastland Hotel and directly billed VCG in a series of invoices for the equipment totaling $604,873. In their aggregate, the invoices sought payment for all of the equipment previously identified and priced in the aforementioned breakdown of costs compiled by Defendants. Just as in the original cost-breakdown, these invoices, unbeknownst to Plaintiff, reflected the total cost of the equipment *plus* the installation costs, profit and overhead attributable to each piece of equipment.[2]

As required by the purchase order, the invoices identified the equipment installed

---

1. The Court stresses that these facts are not conclusive for summary judgment or trial purposes.

2. In this cost-breakdown provided by Pine State, Defendants listed in the left-hand column each of the pieces of equipment that would be sold; the right-hand column appeared to list the price for that piece of equipment. In fact, that price reflected the lump sum cost of the equipment, plus the installa-

by model and serial number. Also as required by VCG's purchase order, as the various pieces of equipment were delivered, installed, and found to meet the Maddens' specifications, one of the Maddens would sign a Completion Certificate and return it to VCG indicating their satisfaction. VCG attempted to perfect its rights in the equipment by filing what it believed were sufficient financing statements using the information and serial numbers contained in the invoices.[3] However, without telling Plaintiff, at the last moment Defendants had switched the brand of equipment they were installing in the Eastland; instead of noting this on the purchase order, they simply made up serial numbers to correspond with the old equipment that was listed on the Purchase Order.[4] Defendants had falsified the serial numbers and misrepresented the brands and models of the equipment in the invoices. When the Maddens' real estate mortgage was foreclosed in February of 2000,[5] VCG's ownership and its attempts to recover possession of its HVAC equipment were challenged and opposed by the purchaser at the foreclosure auction which asserted that it owned the HVAC equipment free and clear of VCG's lease. It made this assertion based on the claim

that the description and serial numbers of the equipment actually installed in the Eastland were different than those specified in the Master Lease and the UCC Financing Statements. Therefore, according to the purchaser, the leased equipment had become fixtures on the real estate which passed to the purchaser through the foreclosure free of VCG's lease.

VCG's attempt to obtain possession of the leased equipment in a subsequent Forcible Entry and Detainer action ended in a settlement with Portland Hotel Associates ("PHA"), the successful bidder at the foreclosure action. VCG netted $23,682 from the sale of the equipment to PHA. Plaintiff VCG now claims in the present action to have lost $580,801, the difference between the amount it paid for the equipment and the net amount it received from the sale of the equipment to PHA. It further claims to have lost $69,131 as the lost benefit of its bargain under the Master Lease, representing the balance of lease payments it would have received had all lease payments been made less the aggregate of all lease payments actually made. Given these losses Plaintiff asks for an attachment on the property of each of the Defendants in the amount of $650,000, on the grounds that it is more

tion, labor and cost of materials. *See* Exhibit A attached to Motion for Attachment; *see also* Deposition of Samuel Marcisso at 32–33.

3. Pursuant to Paragraph 10 of the Master Lease, VCG was to remain the sole owner of the equipment leased to the Maddens, with the latter having no property interest therein, but only the right to use the equipment upon the terms and conditions of the lease. The Master Lease stated that

the Equipment shall remain personal property, and no matter how connected with or attached to the premises of Lessee, will not become a part of the realty of the fixture therein. Lessee, if so requested by Lessor, will obtain written consent of or written waiver from any other party holding a

mortgage, encumbrance or lien on the premises of Lessee, disclaiming any interest in the Equipment. In the event of sale of same, the Equipment shall remain personal property.

Master Lease Agreement, Attached as Exhibit B to Motion for Attachment (Pleading No. 3).

4. Plaintiff's Purchase Order required that the serial number for each piece of equipment be provided before payment could be tendered. *See* Exhibit F attached to Motion for Attachment.

5. The Maddens earlier defaulted on their lease payments to VCG, and the latter gave formal notice of default of the Master Lease to the Madden Group in October 1999.

likely than not that Plaintiff will recover judgment against these Defendants in amounts equal to or greater than the requested attachment amounts, and that there is not any liability insurance, bond, or other security, or any property or credits attached by other writ of attachment or by trustee process, available to satisfy the judgments. Motion for Attachment at 11.

## II. DISCUSSION

As directed by Federal Rule of Procedure 64, this action for "seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered" is governed by Maine Rules of Civil Procedure 4A and 4B and the associated interpretive decisions of the Maine Law Court. *See* FED. R. CIV. P. 64; *Hilton Sea, Inc. v. DMR Yachts, Inc.*, 750 F.Supp. 35, 36 (D.Me.1990). Maine Rule 4A holds that attachment may be ordered by the Court upon a finding that

It is more likely than not that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the aggregate sum of the attachment and any liability insurance, bond or other security, an any property or credits attached by other writ of attachment or by trustee process shown by the defendant to be available to satisfy the judgment.

Me.R.Civ.P. 4A(c). This rule contemplates that the only issues in deciding a motion for approval of attachment "are (1) the amount of the judgment that the plaintiff [will more likely than not recover] [6] and (2) the amount of any liability insurance or other security that is already available to satisfy the judgment." *Sinclair v. Anderson*, 473 A.2d 872, 874–75 (Me.1984).

In making its Motion for Attachment, Plaintiff asserts that it is more likely than not that it will prevail in showing that Defendants committed fraud, fraudulent and negligent misrepresentation, and breach of contract. Motion for Attachment at 6–10. In support of its Motion, Plaintiff has submitted the Affidavit of Larry Holleman (Pleading No. 2) ("Holleman Affidavit"), the vice president and general manager of VCG.

a. Plaintiff's Likelihood of Success

Under Maine law, a defendant is liable for fraud if the following elements are established by clear and convincing evidence:

The defendant (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage.

*St. Francis De Sales Fed. Credit Union, et al. v. Sun Ins. Co. of New York*, No. Ken–01–167, 802 A.2d 982, 2002 WL 1770709, at *5 (Me. Aug.2, 2002) (*citing Letellier v. Small*, 400 A.2d 371, 376 (Me.1979)). Plaintiff alleges that Defendants knowingly made false statements of material facts with the intention of inducing Plaintiff into making payments of $604,483 for equipment that was worth only $211,000. Motion for Attachment at 7. Plaintiff further alleges that it justifiably relied on the statements of Defendants as to the price, brand and model of the equipment sold, and that in so doing, incurred damages in the amount of $649,932. *Id.* at 9.

**6.** Prior to 1992 the standard for attachment was only "reasonable likelihood of success;" the rules governing attachment and attachment on trustee process were amended effective February 15, 1992, to change this standard to the "more likely than not" standard. Me. R. Civ.P. 4A Advisory Committee's Note to 1992 Amend., Me. Rptr., 604 A.2d No. 2 CXLII–CXLIV.

The Court **FINDS,** for purposes of acting on the pending motion, that Plaintiff has shown that it is more likely than not that it will succeed on this claim. Defendant Marcisso admitted in deposition testimony that the price he charged VCG for the purchase of the equipment was for the cost not just of the equipment, but of the materials, labor, profit and overhead as well. Deposition of Samuel Marcisso at 21–22. He further admitted to not only ordering and installing a brand of equipment different from what was listed on the purchase order provided by VCG, *id.* at 35–36, but to making up the serial numbers that VCG required be noted on the Purchase Order for each piece of equipment. *Id.* at 62–63. Defendant Marcisso's testimony reflects that he knew that what he was doing was not above-board: he expressed that he had some concerns about making up serial numbers, but was told that to do otherwise would just "slow it down." *Id.* at 35–36, 63. Defendant Marcissco admitted, "I just wanted to make sure I got paid for the work I was doing and went along with it." *Id.* at 62.

The following testimony further damages any disclaimer of intent on the part of Defendant Marcisso with regard to the price charged to VCG:

Q: And the Maddens asked you to frame your proposal as though the equipment alone would cost $604,000, correct?

A: That's what they asked for, yes.

Q: And did they ask you to do this so that they could obtain financing for equipment that would cover not only the equipment but all the installation and labor costs?

A: That's what they asked me to do, yes.

*Id.* at 68. Defendant Marcisso's testimony suggests that he knew that taking these actions was the surest way for him to obtain payment for the work he was undertaking. For these reasons, Defendant Marcisso and his company Pine State fraudulently misrepresented both the price of the equipment it was selling to Plaintiff, and the actual nature of the equipment itself, substituting different brands at the last minute and fabricating serial numbers to correspond with the equipment.

The only remaining element of fraudulent misrepresentation to be met is that of justifiable reliance. Just this year the Maine Law Court has spoken on this issue: "We have stated that a party 'may justifiably rely on the fraudulent misrepresentation of [another] ... without investigating the truth or falsity of the representation. Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him.'" *St. Francis DeSales,* 802 A.2d 982, 2002 WL 1770709 at *5 (*quoting Sargent v. Sargent,* 622 A.2d 721, 723 (Me.1993) (citation omitted)). *See also Ferrell v. Cox,* 617 A.2d 1003, 1006 (Me.1992). Plaintiff received executed Completion Certificates confirming that the equipment set forth in the invoices had been delivered and installed, and that it met their specifications and was acceptable to them. Holleman Affidavit ¶ 30. Based on Defendants' apparent fulfillment of their end of the bargain, Plaintiff made payments to the Defendants for a total amount of $604,873. *Id.* ¶ 31. There was no obvious reason for Plaintiff not to believe Defendants' representations as to the price of the equipment it was selling, or its representations that the equipment it listed was in fact the equipment that Plaintiff was paying for, and that the serial numbers were genuine. Plaintiff justifiably relied upon these representations. "The reliance was justified because plaintiffs did not know of its falsity, and its falsity was not obvious." *Estate of Whitlock,* 615 A.2d 1173, 1176 (Me.1992).

Plaintiff has shown that it is more likely than not that it will succeed on its claim of

fraudulent misrepresentation. Defendants made a false representation of a material fact that they knew to be false, with the intention of inducing Plaintiff to provide the financing for the HVAC system and its installation in the Eastland Hotel. Lastly, Plaintiff justifiably relied on the false representations that were made.[7]

Because Plaintiff has shown that it is more likely than not that it will succeed on its fraud claim, it is unnecessary for purposes of the attachment motion to discuss its chances of success on the negligence and breach of contract claims. As discussed below, the Court will look to the likely damages resulting from the fraud to determine the proper attachment amount.

### b. Liability Insurance

Defendants have not shown that they possess liability insurance that will satisfy any potential judgment that may be decided against them. Although Defendants point to a Commercial General Liability insurance policy issued by Hanover Insurance Company ("Hanover") as providing the necessary insurance coverage, the Court is not convinced that this insurance policy provides such coverage. Although Hanover has orally agreed to defend Defendants in this action, see Supplemental Affidavit of Christopher C. Taintor (Pleading No. 13) ¶ 5, this does not mean that Hanover will in fact *indemnify* Defendants if a judgment is entered against them.[8] The duty to defend is much broader than the duty to indemnify: a defendant is "entitled to a defense 'if there exists any legal or factual basis which could be developed at trial which would obligate [the insurance company] to pay under the policy.'" *Endre v. Niagara Fire Ins. Co.*, 675 A.2d 511, 513 (Me.1996) (*quoting NE Properties,*

---

7. Defendants' attempts to divert attention from the issue of their fraud is unavailing. Defendants have pointed to Plaintiff's settlement with PHA as a reason to refute the claim that Plaintiff sustained any loss. Defendants' Memorandum in Opposition to Motion for Attachment and Attachment on Trustee Process (Pleading No. 6) at 8. Defendants claim that this settlement interrupts proximate causation, and that in any event, Plaintiff must show the settlement was necessary and reasonable. *Id.* at 8–12. The Court does not accept this argument. First of all, "[i]t is true that a 'plaintiff has a duty to use reasonable efforts to mitigate his or her damages.'" *Ludington v. LaFreniere,* 704 A.2d 875, 879 (Me.1998) (*quoting Doughty v. Sullivan,* 661 A.2d 1112, 1122 (Me.1995)). Plaintiff's efforts to obtain what it could from PHA for the HVAC equipment and then apply that against any loss it is claiming against Defendants do not disrupt any proximate causation resulting from the actions of Defendants; on the contrary, they are a reasonable effort to mitigate damages.

Moreover, the Supreme Judicial Court of Maine this year rejected the very argument that Defendants are advancing in this case. In doing so, the Court cited the collateral source doctrine, which provides that "if a plaintiff is compensated in whole or in part for his damages by some source independent of the tortfeasor, he is still permitted to have a full recovery against [the tortfeasor]." *St. Francis De Sales,* 802 A.2d 982, 2002 WL 1770709 at *3 (*quoting Werner v. Lane,* 393 A.2d 1329, 1335 (Me.1978)). The Law Court thus rejected the defendants' contention that the collateral source evidence in that case showed there to be no proximate cause. *Id.* at *4. The Court similarly rejects this argument in this case.

8. The Court also notes the confusion with regard to the Hanover policy. Defendants attach as Exhibit J to their Motion for Attachment a copy of the insurance contract and policy that it alleges would cover any judgment against them, but the name of the insurance company on that Commercial General Liability Declaration is Massachusetts Bay Insurance Company. However, attached to Defendants' counsel's supplemental affidavit is a copy of what appears to be an identical policy, but Defendant refers to this policy as that issued by Hanover Insurance Company. While the relationship between these two companies may be clear to Defendants, it is not clear from the pleadings and therefore not clear to the Court.

*Inc. v. Chicago Title Ins. Co.*, 660 A.2d 926, 927 (Me.1995) (citation omitted)). However, the insurer's duty to indemnify " 'may depend on the actual facts or legal theory behind the underlying action against the insured by the injured party,' " and therefore a decision as to the duty to indemnify cannot issue "until the trial court has had an opportunity to examine the fully developed facts of the underlying action and 'decide whether the insurance contract language requiring indemnification is met in the present circumstances.' " *Id.* (*quoting Mullen v. Daniels*, 598 A.2d 451, 453 (Me.1991)).

It is especially unclear in this case whether there will in fact be a duty to indemnify. Defendants cite the language in Hanover's policy that covers "property damage," which is defined as either "physical injury to tangible property" or the "loss of use of tangible property that is not physically injured." Defendants' Memorandum in Opposition to Motion for Attachment and Attachment on Trustee Process (Pleading No. 6) at 12–13. Defendants maintain that conduct which interferes with the possession of personal property inflicts "property damage" within the meaning of this policy term, and that if the Court finds that Defendants' actions deprived Plaintiff of the ability to assert its legal interest in the equipment against the foreclosure purchaser, that this constitutes the "loss of use of tangible property" for which it is covered by Hanover's policy. *Id.* at 13–14.[9]

It is not clear from the pleadings that such loss will in fact be covered. If anything, rather than meeting the burden of establishing available liability insurance, Defendant has shown that the duty of the insurers to indemnify is in issue and in

doubt. Again, as indicated above, the duty to indemnify, unlike the duty to defend, depends upon the facts that are brought out at trial, and not upon how Defendants allege the facts to be. The Court cannot find at this point on this record that it is more likely than not that Hanover will be obligated to indemnify Defendants should a judgment be entered against them. Therefore Defendants have not shown to the satisfaction of this Court that it has liability insurance to satisfy a potential judgment.

### c.    Amount of Attachment

According to Section 549 of the Restatement (Second) of Torts (1976),

(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

(2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

*See also Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me.1987). Plaintiff claims damages in the amount of $580,941, the difference between what it paid for the HVAC equipment ($604,873) less the net

---

9.    Defendants' policy also contains an exclusion for "Expected or Intended Injury." *See* Commercial General Liability Coverage Form, attached to Supplemental Affidavit of Christopher C. Taintor at 1. It is at this point also unclear whether Defendants' alleged deliberate fraudulent misstatements will fall under such an exclusion.

recovery it received from PHA for the equipment ($23,932).[10] Plaintiff also claims $69,131 in damages as its lost benefit of the bargain,[11] for a total of $649,932 in claimed damages. However, the Court is unable to conclude that it is more likely than not that Plaintiff will recover the $69,131 claimed as the lost benefit of the bargain; based on the instant record, the Court is not persuaded that it is more likely than not that the Plaintiff will succeed in proving the causation necessary to recover its lost benefit of the bargain from Defendants. Therefore, the Court does not include this figure in the amount of the authorized attachment, and **FINDS** the amount that Plaintiff is more likely than not to recover in this action to be $580,941. The Court hereby **ORDERS** that an attachment in the amount of $580,941 be placed jointly and severally upon the assets and property of Defendants Pine State and Marcisso to secure satisfaction of any judgment ultimately to be entered.

So **ORDERED.**

---

10. As the Court has noted at *supra* note 7, it appears that the Plaintiff may not be required under Maine law to deduct this amount from its claim of loss, as it may be deemed to be from a collateral source. *See St. Francis De Sales*, 802 A.2d 982, 2002 WL 1770709 at *3. However, as no issue has been here generated in that respect, the Court has accepted the Plaintiff's voluntary deduction of that amount from its loss claim and intimates no decision on any potential issue in respect thereto.

11. Plaintiff reached this figure by subtracting what it received in lease payments from the Maddens before they defaulted ($254,614) from what it had expected to receive in total profits. ($323,745).